[No. S004192. Oct. 5, 1989.]

MASON HARRY ROSE V, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

David A. Clare for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

**OPINION**

**THE COURT.**—The Review Department of the State Bar Court has recommended that petitioner Mason Harry Rose V be disbarred from the practice of law in California and that he be ordered to comply with the requirements of rule 955, California Rules of Court. Petitioner was admitted to the practice of law in California in January 1971 and has no record of prior discipline.

Disciplinary proceedings were initiated against petitioner in 1984 through issuance of three notices to show cause which were consolidated for

hearing. An amended notice to show cause charging eight counts was issued in January 1986. The charges were tried on six days during the period February to July of 1986. The hearing panel found misconduct on seven of the eight counts and recommended that petitioner be suspended from the practice of law for five years, that this suspension be stayed, and that petitioner be placed on probation on conditions which would include one year of actual suspension. In July 1987, the review department adopted the hearing panel's findings of fact and its statement of aggravating and mitigating circumstances, but it concluded that petitioner should be disbarred.[1]

Petitioner challenges the sufficiency of the evidence to support findings of misconduct in four of the seven counts. He concedes the discipline recommended by the hearing panel is appropriate but maintains that disbarment, the review department's recommendation, is excessive. Before determining what discipline is appropriate, we will consider the seven counts in turn, summarizing the State Bar's findings as to each and evaluating petitioner's objections thereto in light of the following principles. ▪ While we independently review the evidence, the findings of the State Bar Court are viewed with "great deference, particularly when based on evaluations of credibility." (*Maltaman* v. *State Bar* (1987) 43 Cal.3d 924, 932 [239 Cal.Rptr. 687, 741 P.2d 185].) The petitioner bears the burden of demonstrating error in the findings (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82]) but he may satisfy the burden by demonstrating that the charges are not sustained by convincing proof and to a reasonable certainty (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177]).

THE VASH AND WOOTEN MATTERS (COUNTS ONE AND TWO)

Petitioner was retained on a contingency fee basis by Dr. Carolyn L. Vash, who is confined to a wheelchair, to bring an action for damages against the Los Angeles Music Center Operating Company for personal injuries and civil rights violations allegedly caused by failure to make its premises accessible to persons with handicaps. Petitioner employed Richard D. Wooten as an expert witness in this litigation. In January 1979 Wooten billed petitioner $300 for his services.

---

[1] The State Bar's brief proceeds on the assumption that the review department, because it did not adopt the hearing panel's conclusions of law, necessarily found misconduct on all eight counts. This assumption appears unwarranted. While the review department clearly disagreed with the hearing panel's recommendation as to discipline, nothing in the review department's decision suggests any disagreement with the hearing panel regarding the nature of petitioner's misconduct. Accordingly, in our review we will disregard the count as to which the hearing panel found no misconduct.

After the action was tried and while it was on appeal, petitioner negotiated a settlement which included a payment of $10,000 to Dr. Vash. Petitioner deposited the settlement proceeds in his client trust account in September 1982 and immediately withdrew his contingent attorney fee. During the period September 1982 to July 1985, despite Dr. Vash's repeated efforts to contact petitioner by telephone and by mail, petitioner failed to communicate with Dr. Vash regarding the settlement funds and failed to deliver to her that portion of the funds to which she was entitled. Petitioner also failed to pay Wooten's bill. Finally, in July 1985, while these disciplinary proceedings were pending, and the day before petitioner's deposition was scheduled to be taken, petitioner provided Dr. Vash with a list of settlement disbursements and tendered a check in the amount of $4,485, representing her share of the settlement proceeds plus interest. Dr. Vash thereafter paid Wooten.

The hearing panel found that the failure to pay Wooten and the delay in accounting to Dr. Vash for the settlement funds were in part explained, but not justified, by petitioner's having mislaid his case expense records. The hearing panel also found that at some point during the period September 1982 to July 1985 petitioner's client trust account was levied upon by a state agency for unpaid taxes owed by petitioner, but that the levy provided no justification for the delay because petitioner made no effort to have the levy removed or to replace the levied and withdrawn funds with his own monies.

On these counts the hearing panel concluded that petitioner had failed to keep accurate records of funds entrusted to him, to maintain a sufficient balance in his trust account to meet all entrusted obligations, and to account to either Dr. Vash or Wooten. The hearing panel further concluded that petitioner was culpable of violating rule 8-101[2] of the Rules of Professional Conduct[3] and Business and Professions Code[4] sections 6067[5] and

---

[2] In relevant part, rule 8-101 provides: "(B) A member of the State Bar shall: . . . [¶] (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the member of the State Bar and render appropriate accounts to his client regarding them; preserve such records for a period of no less than five years after final appropriate distribution of such funds or properties; and comply with any order for an audit of such records issued pursuant to the Rules of Procedure of the State Bar. [¶] (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the member of the State Bar which the client is entitled to receive."

[3] Unless otherwise noted, all rule references are to the former Rules of Professional Conduct of the State Bar of California, operative until May 27, 1989.

[4] Unless otherwise indicated, all section references are to the Business and Professions Code.

[5] "Every person on his admission shall take an oath to support the Constitution of the United States and the Constitution of the State of California, and faithfully to discharge the duties of any [sic] attorney at law to the best of his knowledge and ability. A certificate of the oath shall be indorsed upon his license." (§ 6067.)

6068,[6] but that petitioner's conduct did not involve moral turpitude. Petitioner does not contest the hearing panel's findings of fact or conclusions of law on these counts and we adopt them.

## THE MULLIGAN MATTER (COUNT THREE)

Bernadette Mulligan retained a law firm in which petitioner was a partner to bring a medical malpractice action on her behalf. The firm filed an action on Mulligan's behalf in November 1975 but it was dismissed in 1981 for failure to prosecute (former Code Civ. Proc., § 583, repealed 1984, now § 583.360). Petitioner did not work on Mulligan's medical malpractice action, nor was he the supervisor of the associate attorneys who did. Petitioner's law firm was dissolved in 1979 and petitioner became a sole practitioner. After learning of the breakup of petitioner's law firm, Mulligan sent two letters and made numerous telephone calls to petitioner in an effort to learn what had happened to her lawsuit. Her letters went unanswered and her calls were never returned, but on one or two occasions she did reach petitioner on the telephone and he promised to look into the matter. Having heard nothing further from petitioner for several months, Mulligan appeared unannounced in petitioner's office in August 1981. At that time petitioner told her he had located the case file and had learned the case had been dismissed. While stating he had not personally worked on the case, petitioner readily admitted the malpractice of his former law firm in allowing the five-year statute to run and offered to make some reparation to Mulligan. Petitioner asked what would be an appropriate amount and Mulligan stated she didn't know except the complaint had sought damages of $100,000. In reply petitioner said that $100,000 was just an arbitrary amount which would have come down eventually. Petitioner promised to send the file to another attorney to determine the value of the claim and promised to inform Mulligan of the result within 60 days.

Thereafter petitioner gave the file to C. Bruce McCaslin, an attorney with whom petitioner shared office space. McCaslin had little experience with medical malpractice actions, assigned a low priority to petitioner's request, and kept the file for some time without ever making an evaluation. Petitioner then gave the file to Richard Norwald, an attorney with whom petitioner was associated in prosecuting a personal injury action in Kentucky. Norwald gave petitioner an oral evaluation stating that Mulligan's lawsuit was worth $5,000 but Norwald died suddenly of a stroke before completing a memorandum stating the basis for the evaluation.

---

[6] "It is the duty of an attorney to do all of the following: . . . [¶] (m) To respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services. . . ." (§ 6068.)

In October 1981, when petitioner had not contacted Mulligan within the promised 60-day period, Mulligan again placed a number of telephone calls to petitioner. When petitioner did not return any of her calls, Mulligan retained another firm to represent her in a legal malpractice action against petitioner and his former law firm. In September 1982, Mulligan's new attorneys by letter requested that petitioner execute a substitution of attorneys in the medical malpractice action and give them the case file. Petitioner did not respond to this letter. In March 1983, after the matter was referred to the State Bar, and after being served with an action for legal malpractice, petitioner sent the medical malpractice case file to Mulligan's new attorneys. Mulligan's legal malpractice action against petitioner and his former law firm was eventually settled for $12,000.

In regard to the Mulligan matter, the hearing panel's legal conclusions were: (1) petitioner violated rule 2-111(A)(2)[7] by willfully failing to return a client's file upon termination of representation; (2) petitioner violated rule 6-101(A)[8] by willfully failing and refusing to communicate with a client; and (3) petitioner's acts did not involve moral turpitude.

■ Petitioner correctly argues that imposing discipline for willfully failing and refusing to communicate with Mulligan would be improper as this conduct was never charged. (*Gendron* v. *State Bar* (1983) 35 Cal.3d 409, 420 [197 Cal.Rptr. 590, 673 P.2d 260].) Willful failure to communicate with Mulligan was not among the charges stated in the amended notice to show cause, and when the examiner began to introduce evidence on this issue, the hearing panel instructed the examiner to move to another area as evidence of petitioner's failure to communicate with Mulligan was not relevant to any of the charges. Disciplinary charges against an attorney may be amended to conform to proof, provided the attorney is given a reasonable opportunity to defend against the charge (*ibid.*), but here the examiner acquiesced in the hearing panel's ruling and did not move to amend count three to add a charge of willful failure to communicate with the client. Accordingly, we do not adopt the hearing panel's findings or conclusions in regard to this charge.

---

[7] "In any event, a member of the State Bar shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules." (Rule 2-111(A)(2).)

[8] "(1) Attorney competence means the application of sufficient learning, skill, and diligence necessary to discharge the member's duties arising from the employment or representation. [¶] (2) A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently." (Rule 6-101(A).)

■ The conclusion that petitioner violated rule 2-111(A)(2), by willfully failing to return a client's file upon termination of representation, is challenged by petitioner on the grounds that he had no duty to return the case file of a finally concluded action and that, in any event, he returned the file as soon as he was able to retrieve it following the unexpected death of the attorney to whom he had given it for evaluation.

Whether an attorney has a duty to surrender uncommunicated work product to a client for the client's use in a malpractice action against the attorney appears to be an open question. (See *Lasky, Haas, Cohler & Munter* v. *Superior Court* (1985) 172 Cal.App.3d 264, 271-279 [218 Cal.Rptr. 205].) But there can be no doubt that the balance of an attorney's litigation file is the property of the client and must be surrendered promptly upon request to the client or the client's new counsel once the representation has terminated. (*Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1098 [245 Cal.Rptr. 628, 751 P.2d 894]; *Finch* v. *State Bar* (1981) 28 Cal.3d 659, 665 [170 Cal.Rptr. 629, 621 P.2d 253]; *Kallen* v. *Delug* (1984) 157 Cal.App.3d 940, 950 [203 Cal.Rptr. 879]; see also, *DeMassa* v. *Nunez* (9th Cir. 1985) 770 F.2d 1505, 1507.) Assuming for argument's sake that Mulligan's file included uncommunicated work product which petitioner was not required to surrender, he was unquestionably obligated to surrender the balance of the file whether the case to which the file related was pending or had finally terminated.

We conclude that the evidence supports the finding that petitioner delayed unreasonably in surrendering the Mulligan case file. Mulligan's new counsel requested the file in September 1982 and petitioner did not comply until March 1983. We accept the hearing panel's implied determination that petitioner's explanation for the delay was not credible. Petitioner testified that he surrendered the file as soon as he was able to retrieve it from Norwald's estate, but his testimony on this point was vague as to both the relevant dates and the efforts he made to recover the file, and petitioner provided no documentary evidence to corroborate his testimony. Also, petitioner's testimony was inconsistent with that of his own witness, McCaslin, who stated that petitioner gave the file to him a second time for evaluation after it was retrieved from Norwald's estate. We conclude that petitioner's conduct in willfully failing to deliver the case file promptly upon the client's request violated rule 2-111(A)(2), but that this conduct did not involve moral turpitude.

THE HEFFERNAN-LUDWIG MATTER (COUNT FOUR)

A Marine Corps CH-53 helicopter crashed on August 2, 1978, injuring Timothy Heffernan and John Ludwig, neither of whom was at that time

acquainted with petitioner. They were taken to a hospital in San Diego. Both suffered spinal column injuries, and Ludwig was rendered paraplegic. A few days after the accident petitioner telephoned Heffernan at the hospital, stating that he was an attorney and that he wished to discuss the crash. Heffernan agreed to meet with petitioner.

On or about August 6 or 7, petitioner visited Heffernan at the hospital. After discussing the circumstances of the crash in which Heffernan was injured, petitioner (who is confined to a wheelchair) explained that he also had been injured in the crash of a military aircraft. Petitioner mentioned a crash of another CH-53 helicopter, stating that he was representing parties injured in this other crash, that their injuries were similar to Heffernan's, and that one of the purposes of his visit was to seek information that might be useful in representing these other parties. Petitioner asked whether Heffernan and Ludwig were represented by counsel and whether they had any thoughts about pursuing litigation. Petitioner stated that one of the legal theories he was pursuing in the other CH-53 case was that the helicopter was not crashworthy because the seats were not cushioned against impact, that this was a novel theory of liability but probably the only viable one for Heffernan and Ludwig, and that petitioner would be interested in representing both Heffernan and Ludwig if they wanted to pursue this. Heffernan suggested petitioner speak to Ludwig, who was in the same hospital. Petitioner left his business card. This was the only time that Heffernan ever met with petitioner in person.

Petitioner then met for approximately 30 to 45 minutes with Ludwig, who had just been released from intensive care, and who had just been told he might never walk again. Petitioner explained that he was an attorney, that he had been disabled by an aircraft accident, that he was representing parties in relation to another crash of a CH-53, and that this other crash was similar to the one in which Ludwig and Heffernan had been injured. Petitioner then asked if Ludwig wanted to retain petitioner as part of the litigation. Ludwig told petitioner that a lawsuit was the furthest thing from his mind and that maybe they could discuss it at a later date.

Petitioner approached Ludwig again on August 15, 1978, while Ludwig was confined to his bed in the spinal cord injury section of the Veterans Hospital in Long Beach. Petitioner asked how Ludwig was doing and whether he had made any decisions about litigation. Petitioner stated it would be to Ludwig's benefit to not waste time and to make a decision if he wanted to pursue legal matters. Ludwig orally agreed to retain petitioner.

On August 18, 1978, petitioner wrote to the Department of the Navy, stating that he represented both Heffernan and Ludwig for the purpose of

exploring claims against the helicopter manufacturer and requesting investigative reports regarding the crash. Petitioner sent copies of the letter to both Ludwig and Heffernan. Although Heffernan had not retained petitioner, he did not object to this effort by petitioner to gather information concerning the crash.

In December 1978 petitioner sent two copies of a contingent fee agreement to Ludwig. Ludwig sent one copy to Heffernan, and shortly thereafter both Ludwig and Heffernan executed the agreements retaining petitioner on a contingent fee basis to bring a products liability action against the helicopter manufacturer on a theory that the CH-53 was not crashworthy. Petitioner never told Heffernan or Ludwig that the filing of an action on their behalf would depend on the outcome of another lawsuit or that a lawsuit would not be filed unless they personally advanced or guaranteed payment of costs.

During 1979 Ludwig saw petitioner at the hospital on one or more occasions. When Ludwig inquired how the case was progressing, petitioner replied that progress was satisfactory and that "the wheels of justice take time," or words to that effect. During 1980 Ludwig made several unsuccessful attempts to contact petitioner regarding the case. Ludwig finally reached petitioner by telephone at petitioner's office in early 1981. During the conversation Ludwig was led to believe that his case was active and that things were progressing, but that petitioner was waiting on the outcome of a similar case.

During 1981 both Ludwig and Heffernan became dissatisfied with petitioner's representation. It appeared nothing had happened in a long time and neither had been able to get in touch with petitioner. Heffernan sent a letter to petitioner by registered mail in September 1981 requesting the date when suit had been filed on his behalf, the case number of the suit, and the current status. The letter was mailed to the law firm address petitioner had given Heffernan, but the letter was returned unopened. Petitioner had not advised Heffernan that he had moved his office. Ludwig sent similar letters to petitioner by registered mail in December 1981 and February 1982. Each time Ludwig received the signed receipt back but no reply from petitioner. In March 1982 Ludwig sent a letter to petitioner by certified mail stating he would contact the State Bar if he did not receive a reply within 14 days. Still no reply. Ludwig then reported the matter to the State Bar and retained another attorney to determine the status of the products liability action. This attorney was able to determine that petitioner had not filed an action on behalf of Ludwig or Heffernan. Ludwig thereafter filed a legal malprac-

tice action against petitioner. This action remained pending at the time of Ludwig's testimony before the hearing panel.

Petitioner testified that he did not file an action on behalf of Ludwig and Heffernan because it would have cost $100,000 to develop expert evidence to support the theory that the CH-53 was not crashworthy and this expense could be met only if the theory could be employed also in the other CH-53 case but that other case eventually settled on a different basis.

The hearing panel concluded on this count that petitioner had violated rule 2-101[9] and section 6152[10] by actively soliciting professional employment for pecuniary gain, and had violated rule 6-101 by willfully failing and refusing to communicate with his clients. The panel further concluded that these acts did not involve moral turpitude.

 Petitioner concedes he committed misconduct by failing to communicate with Ludwig and Heffernan, but he maintains the evidence was insufficient to support the findings and conclusions that he violated the proscriptions against solicitation of potential clients.

Petitioner challenges the hearing panel's finding that his personal contact with Heffernan occurred on the same day as his first telephone contact, noting that Heffernan testified the personal contact was a few days after the telephone call. However, petitioner himself testified that after the telephone call he "went immediately, probably the same day" to meet Heffernan at the hospital. Petitioner may not be heard to complain that the hearing panel based its finding on petitioner's own testimony.

Petitioner next challenges the hearing panel's finding that between his first and second meetings with Ludwig, petitioner wrote at least three investigatory letters on the matter, holding himself out as the attorney for Heffernan and Ludwig. We agree this finding is in error (the only investigatory letter in evidence was written after the second meeting with Ludwig) but no prejudice resulted since, as we conclude below, the evidence amply supports the solicitation finding.

---

[9] "No solicitation or 'communication' seeking professional employment from a potential client for pecuniary gain shall be delivered by a member or a member's agent in person or by telephone to the potential client . . . unless the solicitation or 'communication' is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. . . ." (Rule 2-101(B).)

[10] "(a) It is unlawful for: [¶] (1) Any person . . . to solicit any business for any . . . attorneys in and about . . . city receiving hospitals, city and county receiving hospitals, county hospitals . . . or in any public institution . . . or in and about private hospitals . . . ." (§ 6152.)

Finally, petitioner challenges a finding that, before his first contact with Heffernan, petitioner had contacted a relative of Heffernan seeking his whereabouts. On this point petitioner testified he did not recall contacting Heffernan's relatives but he might have. We need not determine whether the finding is supported as it is not of real significance to the solicitation finding. It is undisputed that petitioner wanted to speak to Heffernan and sought him out for that purpose.

■ In a multiclaimant accident, an attorney representing one claimant may call on others in the course of investigation and development of evidence (*Colonial Life & Accident Ins. Co.* v. *Superior Court* (1982) 31 Cal.3d 785, 794 [183 Cal.Rptr. 810, 647 P.2d 86]) and the same is no doubt true in regard to the victims of separate but causally related accidents. An attorney who contacts accident victims for legitimate investigative purposes is not barred from representing them if requested to do so, but it is misconduct to directly solicit such employment. (*Ibid.*; see also, *Kitsis* v. *State Bar* (1979) 23 Cal.3d 857, 863-864 [153 Cal.Rptr. 836, 592 P.2d 323]; *Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 133-139 [77 Cal.Rptr. 233, 453 P.2d 737].) ■ Here the testimony of Heffernan and Ludwig provided persuasive evidence that petitioner stepped over the line separating legitimate investigation and information sharing from prohibited direct solicitation. We find that petitioner did engage in solicitation in violation of rule 2-101(B) and section 6152.

THE FULTZ MATTERS (COUNTS SIX AND SEVEN)[11]

Susan Fultz, whose husband was killed in the crash of a military helicopter, retained petitioner in December 1976, on behalf of herself and her two minor children, to prosecute a wrongful death action against the helicopter's manufacturer. In June 1980 Fultz learned from petitioner that the action had been settled. Fultz traveled from her home in Denver, Colorado, to Los Angeles to execute the settlement documents. A short time later petitioner telephoned Fultz and asked if she had any idea what she would do with the settlement proceeds, which she had not yet received. Fultz said she had not thought about it, she knew nothing about the stock market, and she would probably put the money in a bank savings account for the time being. Petitioner said that he had an opportunity, through a friend named H. L. "Buster" Quist, to invest in a franchise restaurant in Arizona called "Salad Bar," that he was considering it for himself, and that it might be

[11] Count five of the amended notice to show cause charged petitioner with improperly soliciting employment from Fultz. The hearing panel concluded that the evidence presented on this count did not establish misconduct.

something Fultz would also want to consider. After further discussion Fultz agreed to meet petitioner in Arizona to look at the restaurant operation. Petitioner made the travel arrangements and paid the airfare.

Fultz was met at the airport by petitioner and Quist. They went to the corporate headquarters of Salad Bar to hear a presentation by the head of the company, and then to a Salad Bar restaurant in a hotel for lunch. Petitioner and Quist also showed Fultz a potential site for a Salad Bar franchise. Fultz was told she would be investing in equipment that would be leased to the restaurant. She agreed to make the proposed investment.

Petitioner and Quist met Fultz in Denver on July 24, 1980. Petitioner gave Fultz a check for $93,480, representing her share of the settlement proceeds,[12] and Fultz wrote a check in the amount of $70,000, payable to Fultz Leasing Company, which she gave to Quist. At Fultz's request, petitioner explained and diagrammed the structure of the business. Fultz Leasing Company of Arizona (Fultz Leasing), a limited partnership, would purchase restaurant equipment and lease it to Let-Us Developers of Arizona, Inc. (Let-Us), commencing August 15, 1980. Let-Us would operate a Salad Bar restaurant franchise. For her $70,000 investment, Fultz would receive a 99 percent interest in Fultz Leasing as the limited partner and 10 percent of the stock of Let-Us. Quist Management and Development Corporation of Arizona (Quist Management), a corporation owned and controlled by Buster Quist, was the general partner of Fultz Leasing and held the remaining 1 percent interest. Quist was also president of Let-Us.

Petitioner told Fultz she could consult another attorney if she felt she needed to, but he did not advise her she should. On the contrary, he assured her he had reviewed all the documents and felt very sure it was a good investment for her. He did not discuss the risks of the investment. Petitioner told Fultz several times that he had a fiduciary duty to her, that this was a higher duty than the ordinary duty owed by an attorney to a client, and that this duty would continue forever. He did not say anything about having an actual or potential conflict of interest in relation to the investment, nor did he say he was receiving any compensation as a promoter for inducing her to invest in the restaurant equipment.

In fact, petitioner and Quist had agreed that petitioner would receive 25 percent of the stock of Let-Us for his services in locating a source of funds

---

[12] In addition, Fultz's two minor children, as part of the settlement, each received $58,425 paid into blocked treasury bill accounts at a financial institution in California, there to be held in trust for the minors.

for the equipment and for his assistance in obtaining financing for the corporation. This arrangement was revealed in the articles of incorporation and the subscription agreement of Let-Us, which Fultz signed.

Fultz received a copy of an equipment lease agreement between Fultz Leasing and Let-Us, showing a term of four years and eleven months, with rental payments of $1,235.70 per month for the first year and $1,692.09 per month thereafter. Fultz began receiving payments under the lease in August 1980. Later she received a copy of a letter from petitioner to Quist, dated September 15, 1980, stating that since petitioner and Quist were instrumental in causing Fultz to invest in the restaurant venture it had been agreed that petitioner and Quist would guarantee the lease payments to Fultz.

The lease payments stopped in August 1981. Fultz telephoned Quist, who told her the restaurant was not doing as well as they had expected. The restaurant closed on December 4, 1981. In a later telephone conversation, Quist told Fultz he had discussed the situation with petitioner and they had decided to either sell the restaurant equipment or ship it to California for use in a restaurant petitioner was planning to open. Eventually Fultz was informed by Quist that most of the equipment had been sent to petitioner in California. At this time Fultz was attempting to contact petitioner concerning a problem with her children's trust accounts (see fn. 12, *ante*), which had not been paying federal or state income taxes on the interest. In May 1982 she succeeded in reaching petitioner by telephone. Petitioner promised to look into the trust account problem, but she heard nothing further from him despite letters she sent him in August 1982 and February 1983. Her telephone calls to petitioner were not returned. Thereafter, in approximately April 1983, she retained an attorney to correct the problem with the trust accounts and to protect her interests in regard to the restaurant equipment lease. Petitioner telephoned Fultz in June 1983 and told her she did not need another attorney because petitioner was still her attorney.

Petitioner's restaurant, known as SunDays, opened in California in February 1983. Although petitioner was using the Fultz Leasing equipment in the restaurant, he did not make payments to or communicate with Fultz. In the latter part of 1983, Fultz received two checks from Quist, in the amount of $1,476.33 and $2,471.30, apparently intended as lease payments. Apart from these two checks, Fultz received no further lease payments.

Fultz filed suit against petitioner and Quist in November 1983 to recover the unpaid lease payments. A default judgment was obtained against petitioner. At the time of the hearing below petitioner was contesting the judgment for lack of personal jurisdiction.

On these facts the hearing panel concluded that petitioner entered into a transaction with a client where there existed a potential or actual conflict of interest without advising the client in writing of the conflict and seeking her consent, in violation of rule 5-101,[13] and failed and refused to account to Fultz for the equipment sent to him by Quist, in violation of rule 8-101 (see fn. 2, *ante*).

■ Challenging the hearing panel's conclusion that he violated rule 5-101, petitioner argues that the transaction was fair and reasonable to Fultz, that petitioner's interest in the transaction was fully disclosed in writing to Fultz, that Fultz was afforded a reasonable opportunity to seek the advice of independent counsel, and that Fultz consented in writing to the transaction after being informed both orally and in writing of its terms.

The facts established by the record present a classic case for application of rule 5-101: "A client who receives the proceeds of a judgment or settlement will often place great trust in the investment advice of the attorney who represented him in the matter. This is especially likely when the client is unsophisticated and a large amount of money is involved. This trust arises directly from the attorney-client relationship, and abuse of this trust is precisely the type of overreaching that rule 5-101 is designed to prevent." (*Hunniecutt* v. *State Bar* (1988) 44 Cal.3d 362, 370 [243 Cal.Rptr. 699, 748 P.2d 1161]; see also, *Beery* v. *State Bar* (1987) 43 Cal.3d 802, 812-815 [239 Cal.Rptr. 121, 739 P.2d 1289].)

The amended information did not charge, nor did the hearing panel find, that the restaurant equipment leasing transaction was not fair and reasonable as to Fultz, so this point need not be addressed. (*Ritter* v. *State Bar* (1985) 40 Cal.3d 595, 602 [221 Cal.Rptr. 134, 709 P.2d 1303].) There is no suggestion in the record that the transaction was not a legitimate business deal or that petitioner did not sincerely believe it would be beneficial to Fultz. Nonetheless, we note that the investment was hardly prudent for a widow with two young children, limited financial resources, and virtually no business experience. As petitioner acknowledged, the resale value of

---

[13] "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto." (Rule 5-101.)

restaurant equipment declines sharply after first use and so Fultz depended almost entirely on the success of a new restaurant, always a doubtful proposition, to recover her investment. Although the transaction involved substantial risks, petitioner did not discuss or emphasize these risks in presenting the proposal to Fultz. (See *Beery* v. *State Bar, supra,* 43 Cal.3d 802, 815.)

Petitioner's interest in the transaction was disclosed to Fultz, as petitioner notes, in the articles of incorporation and subscription agreement for Let-Us, both of which Fultz signed. These documents stated that petitioner was being compensated with corporate stock for procuring financing for the restaurant equipment. However, the documents did not expressly refer to petitioner's actual or potential conflict of interest. In addition, petitioner assured Fultz that he had reviewed all documents on her behalf and that she need have no concern in signing them. Fultz testified that she read these particular documents before signing but did not understand most of the contents. In particular, she testified that she had not been informed, prior to making the investment, that anyone would receive Let-Us stock as promotional consideration for procuring her investment. Thus the disclosure was not made in a manner and in terms reasonably calculated, under the particular circumstances, to be understood by the client. Instead of clearly notifying Fultz that he would profit by her participation in the transaction, petitioner stressed that he was acting as her attorney with a fiduciary duty to protect her interests.

Finally, although petitioner told Fultz she *could* consult another attorney regarding the investment, he did not *advise* her to do so and, to the contrary, implied it was unnecessary because he would be looking out for her interests. ■ When an attorney enters into business dealings with a client, "it is incumbent upon the attorney entering into such transactions to advise the client to seek independent counsel . . . [and] failure to do so constitutes a violation of rule 5-101." (*Ritter* v. *State Bar, supra,* 40 Cal.3d 595, 602.) The evidence thus establishes petitioner's violation of rule 5-101.

■ Petitioner disputes the hearing panel's conclusion that he violated rule 8-101 by failing to account to Fultz for the restaurant equipment after it was shipped to him in California. Petitioner maintains that Fultz at all times knew where the equipment was and did not request an accounting, and that petitioner acted properly in dealing with Quist, as principal of the corporate general partner of Fultz Leasing, rather than with Fultz. Petitioner also alleges he made a fair offer to purchase the equipment, which Fultz refused.

The hearing panel's conclusion on this issue is well supported by the record. The restaurant equipment was owned by Fultz, petitioner's client, through the mechanism of a limited partnership. The equipment was in petitioner's sole possession in California from December 1981 to April 1983, when Fultz retained new counsel, and thereafter. Petitioner did not at any time communicate directly with Fultz regarding the equipment; he failed to return her telephone calls; he did not send her copies of his letters to Quist; and he did not make any lease payments, even though petitioner had induced Fultz to invest in the equipment, had guaranteed the lease payments, had decided jointly with Quist to have the equipment sent to him in California, and was using the equipment in a restaurant in which he had an ownership interest. The purchase offer to which petitioner refers was made indirectly through Quist and only after Fultz had retained new counsel to pursue the matter.

THE SMITH MATTER (COUNT EIGHT)

The facts pertinent to this count were established by stipulation. Petitioner was retained by Claudia Smith on a contingency fee basis to bring a personal injury action, which he filed on her behalf in May 1980. Petitioner filed an at-issue memorandum in May 1983, and he received notice in July 1983 that trial was set for July 1984. Petitioner's motion for continuance was granted on July 16, 1984, and trial was reset for August 27, 1984. From July 16 to August 27, Smith attempted on numerous occasions to communicate with petitioner by telephoning his office, but petitioner willfully failed to return Smith's calls or to communicate with her in any other manner and he willfully failed to perform any further legal services on behalf of Smith. Petitioner willfully failed to appear in court on August 27, and willfully failed to inform Smith, the court, or opposing counsel that he would not be appearing. Because no one appeared for Smith, the action was taken off calendar and the at-issue memorandum was stricken. Smith then sent petitioner a registered letter demanding an explanation and made numerous telephone calls to petitioner's office, but petitioner willfully failed to return the calls or to otherwise communicate with Smith. In July 1985, petitioner was served with a motion to dismiss Smith's action for failure to prosecute, with hearing on the motion set for September 4, 1985. Petitioner willfully failed to inform Smith of the motion, to oppose the motion, and to appear at the hearing.

Petitioner further stipulated that by this conduct he willfully withdrew from Smith's employ prior to taking reasonable steps to avoid foreseeable prejudice to her rights (rule 2-111(A)(2); fn. 7, *ante*), and willfully failed to use reasonable diligence and his best judgment in the exercise of his skill

and in the application of his learning in an effort to accomplish, with reasonable speed, the purpose for which he was employed (rule 6-101(A); fn. 8, *ante*).

## MITIGATION

Petitioner has performed substantial and significant services in civic and charitable endeavors.[14] Petitioner also has handled numerous pro bono actions seeking to advance the rights of handicapped people, has been a lecturer for the State Bar's Continuing Education of the Bar program on products liability, and has been a guest lecturer on military aviation accident litigation at Loyola of Los Angeles School of Law, receiving from that school a certificate for outstanding contributions.

In 1982, after experiencing problems in his marriage for some years, which led ultimately to the marriage's dissolution, petitioner voluntarily began treatment with Dr. Feldman, a clinical psychologist. Dr. Feldman testified that petitioner is a strong achiever and developed an "irrational need for approval" after the injury which rendered him paraplegic. These psychological forces made it very difficult for petitioner to decline requests to engage in community activities and pro bono work, or to set reasonable limits on his involvements in these activities. Petitioner is a perfectionist, and his unwillingness to risk mistakes caused him to procrastinate. Petitioner's psychological condition became worse in 1983, but has improved steadily thereafter. Petitioner remarried in 1985, and he has learned to understand and deal with his emotional problems.

Petitioner testified that he experienced a period of profound depression in 1983 after an adverse verdict was returned in a medical malpractice action in which petitioner represented the plaintiff, who was completely paralyzed. Petitioner also described his role in bringing certain successful landmark legal actions, including a suit against the United States Postal Service to make its facilities accessible to the handicapped (see *Rose v. United States Postal Service* (9th Cir. 1984) 774 F.2d 1355 [78 A.L.R.Fed. 863]) and an

---

[14]Petitioner served on the city council of the City of Rolling Hills for eight years and was mayor for two of those years, served on the Board of Trustees of the Torrance Memorial Hospital Medical Center for five years, was cofounder and a director of the Western Law Center for the Handicapped, served as director of the Los Angeles County Easter Seal Society for seven years, was cofounder and for three years a boardmember of the California Association for the Physically Handicapped, served for three years as a director of the California State Easter Seal Society, served for four years on the California Attorney General's Task Force for the Handicapped, served for one year as chair of the Architectural and Transportation Barriers Compliance Board (a federal agency), served for one year as a boardmember of the American Coalition of Citizens with Disabilities, and served for one year as a boardmember of the National Center for Law and the Handicapped.

action in which he represented a quadriplegic father who had been denied custody of his children on account of his handicap (see *In re Marriage of Carney* (1979) 24 Cal.3d 725 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]). The accuracy of this testimony is not disputed by the State Bar.

DISCIPLINE

■ In determining the appropriate discipline, we attach considerable weight to the recommendations of the State Bar, and give the review department's views more weight than those of the hearing panel. (*Rodgers* v. *State Bar* (1989) 48 Cal.3d 300, 316 [256 Cal.Rptr. 381, 768 P.2d 1058].) But the determination is ultimately made by exercising our own independent judgment. (*Ibid.*; see also, *Twohy* v. *State Bar* (1989) 48 Cal.3d 502, 512 [256 Cal.Rptr. 794, 769 P.2d 976].) This is especially true when, as here, the review department and the hearing panel disagree. (*Levin* v. *State Bar* (1989) 47 Cal.3d 1140, 1148 [255 Cal.Rptr. 422, 767 P.2d 689].)

■ "The imposition of attorney discipline does not issue from a fixed formula but from a balanced consideration of all relevant factors, including aggravating and mitigating circumstances." (*Rodgers* v. *State Bar, supra,* 48 Cal.3d 300, 316; see also, *In re Larkin* (1989) 48 Cal.3d 236, 244 [256 Cal.Rptr. 90, 768 P.2d 604]; *In re Prantil* (1989) 48 Cal.3d 227, 234-235 [255 Cal.Rptr. 890, 768 P.2d 109].) The proper objectives of attorney discipline do not include punishment of the errant attorney; rather, they are protection of the public, the profession, and the courts, maintenance of high professional standards, and preservation of public confidence in the legal profession. (*In re Basinger* (1988) 45 Cal.3d 1348, 1360 [249 Cal.Rptr. 110, 756 P.2d 833]; *Farnham* v. *State Bar* (1988) 47 Cal.3d 429, 445 [253 Cal.Rptr. 249, 763 P.2d 1339].)

■ The record establishes numerous wrongful acts by petitioner in his professional capacity, including willful failure to communicate with clients, willful failure to provide services, willful failure to promptly and properly discharge obligations with regard to client funds and records, improper client solicitation, and improper business dealings with a client. In the absence of substantial mitigating evidence, disbarment would clearly be warranted. Petitioner has, however, provided substantial evidence of several recognized mitigating circumstances.

Petitioner has been in practice since 1971 with no record of prior discipline and the first incident of misconduct found in this proceeding (the Ludwig-Heffernan solicitation) occurred after petitioner had been in

practice for over seven years. (*Rodgers* v. *State Bar, supra,* 48 Cal.3d 300, 317.) It is noteworthy also that although petitioner's acts of misconduct were numerous and serious, none involved moral turpitude.

The record reveals that defendant experienced unusual stress during the breakup of his marriage and underwent profound depression following an adverse verdict in a difficult and emotionally trying personal injury case. Marital and other stressful emotional difficulties may be considered in mitigation. (*In re Mostman* (1989) 47 Cal.3d 725, 742 [254 Cal.Rptr. 286, 765 P.2d 448]; *Hunniecutt* v. *State Bar, supra,* 44 Cal.3d 362, 373-374.) Petitioner also presented the testimony of a qualified expert regarding certain aspects of petitioner's personality which caused him to assume more responsibilities that he could competently handle and to procrastinate when faced with certain kinds of problems, and regarding the progress petitioner has made in recognizing and overcoming these personality defects. This testimony was uncontradicted. ▮ Disabling psychological disorders are mitigating if convincingly established by substantial credible evidence. (*Bowles* v. *State Bar* (1989) 48 Cal.3d 100, 110 [255 Cal.Rptr. 846, 768 P.2d 65]; *Frazer* v. *State Bar* (1987) 43 Cal.3d 564, 576-578 [238 Cal.Rptr. 54, 737 P.2d 1338].) On the other hand, the time constraints of a busy solo practice and lack of management skills have generally not been regarded as mitigating per se, and we do not so regard them here. (*Farnham* v. *State Bar, supra,* 47 Cal.3d 429, 445; *Garlow* v. *State Bar* (1988) 44 Cal.3d 689, 711 [244 Cal.Rptr. 452, 749 P.2d 1307].) ▮ Petitioner voluntarily sought treatment for his condition, a circumstance which we have also recognized as mitigating. (*In re Mostman, supra,* 47 Cal.3d 725, 742.) We also give mitigating weight to petitioner's demonstrated legal abilities, his dedication to the cause of the disabled, and his zeal in undertaking pro bono work. (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 602 [247 Cal.Rptr. 599, 754 P.2d 1096].)

Given the particular facts of this case, the review department's recommendation of disbarment is unduly severe while the hearing panel's recommendation of one year of actual suspension is unduly lenient. We conclude that the discipline set forth below is appropriate in this case.

Disposition

It is ordered that petitioner Mason Harry Rose V be suspended from the practice of law for a period of five years, that execution of the order for suspension be stayed, and that petitioner be placed on probation for a period of five years upon the following conditions: 1. Petitioner shall be

actually suspended from the practice of law in the State of California for the first two years of the period of probation;

2. During the period of probation, petitioner shall comply with the provisions of the State Bar Act and the Rules of Professional Conduct of the State Bar of California;

3. Petitioner shall report in writing to the Office of the Clerk, State Bar Court, Los Angeles, on a quarterly basis, certifying by affidavit or under penalty of perjury that he has complied with the terms of this order during the period covered by the report;

4. During the period of probation, petitioner shall maintain with the Office of the Clerk, State Bar Court, Los Angeles, his current office or other address for State Bar purposes, and his residence address;

5. Except to the extent prohibited by the attorney-client privilege or the privilege against self-incrimination, petitioner shall answer fully, promptly and truthfully any inquiry directed to him personally or in writing by the presiding referee of the State Bar Court or the designee of the presiding referee relating to whether petitioner is complying or has complied with these terms of probation;

6. Petitioner is referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. Petitioner shall promptly review the terms and conditions of his probation with the probation monitor referee to establish a manner and schedule of compliance, consistent with these terms of probation. During the period of his probation, petitioner shall fully furnish any reports concerning his compliance that may be required by the probation monitor referee and shall cooperate fully with the probation monitor referee to facilitate the discharge of the referee's duties as identified in rule 611, Rules of Procedure of the State Bar;

7. Petitioner shall submit to his probation monitor referee a semiannual audit of his client trust fund account compiled by an accountant. The audit shall contain complete information concerning all money received and disbursed during the period since the previous audit.

It is further ordered that during the period of his actual suspension from the practice of law petitioner shall take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners.

Petitioner is ordered to comply with rule 955 of the California Rules of Court and to perform the acts specified in subdivisions (a) and (c) of that

rule within 30 and 40 days, respectively, of the effective date of this order. Failure to comply with California Rules of Court, rule 955 may result in imprisonment. (§ 6126, subd. (c).)

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)