[No. S005551. Feb. 21, 1989.]

IRVING J. LEVIN, Petitioner, v.
THE STATE BAR OF CALIFORNIA; Respondent.

COUNSEL

Richard Ross for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Susan Leventhal for Respondent.

OPINION

**THE COURT.**—We review the unanimous recommendation of the Review Department of the State Bar Court that petitioner Irving J. Levin be suspended from the practice of law for three years. The department recommended that such suspension be stayed on the condition that Levin be placed on probation for three years and be actually suspended for the first six months of the probationary period. We adopt the department's recommendation.

## I. FACTS

Levin does not dispute his culpability and argues only that the discipline recommended by the department is excessive. ■ He has stipulated to the relevant facts and is thus bound by the factual recitals in the stipulation. (*Inniss* v. *State Bar* (1978) 20 Cal.3d 552, 555 [143 Cal.Rptr. 408, 573 P.2d 852].)

### *The Hobbs Matter*

The stipulated facts disclose that in April 1981 Levin, as the personal guarantor of various obligations of Valley Club Service, Inc. (hereafter Valley Club), was sued by Ron Abel Service, Inc., as a result of Valley Club's default on two notes and a lease of a service station. Abel was represented in the action by its attorney, Frank Hobbs.

Shortly after the lawsuit was filed Levin contacted Hobbs to negotiate a settlement. They agreed that Valley Club would stipulate to a judgment for wrongful detainer. When Levin met with Hobbs he represented that he had the authority to sign the stipulation because he was an officer of Valley Club and because its board of directors had met and agreed to surrender the premises. Subsequent to this meeting, however, Hobbs learned that Levin had deceived him: he was not an officer of Valley Club, and the board of directors had not met and agreed to the stipulation.

Hobbs confronted Levin and questioned him about these misstatements. The latter admitted the deceit and claimed that because Valley Club's potential liability was as high as $1 million he was under intense pressure from his coventurers to settle the matter. In an effort to rectify the situation Levin stated that he had communicated informally with all the directors and offered to sign a statement indicating that the board of directors had met. Hobbs refused the offer. Thereafter Levin contacted Hobbs's associate, Dennis Harkavy, and tried to persuade him to assign the Valley Club case to an attorney who was not aware of the facts so that the stipulation could be filed. Harkavy refused.

In addition to his acts of deception, Levin also tried on numerous occasions between March and September 1981 to communicate with Hobbs's client, Ron Abel, outside of the lawyer's presence. In May 1981 Hobbs sent Levin a letter asking him to stop these communications. Despite this and other letters, Levin nonetheless persisted in his efforts to discuss the case with Abel, believing that in his role as a party-litigant he could communicate with his adversary without consulting or informing the attorney. Rather than cease his attempts, Levin instead requested an opinion from the

State Bar in July 1981 concerning the propriety of these communications. Only after he received a reply from the State Bar stating that such communications were unethical did he stop his direct contacts with Abel.

*The Johnson Matter*

In the stipulation Levin also acknowledged that in September 1982 Gwendolyn Johnson retained him to represent her in a personal injury action arising out of an automobile accident. Jamiel Hayes, Johnson's cousin, and a relative of the injured driver of the car, Jessie Harris, referred Johnson to Levin. As part of the retainer agreement Johnson gave an unnamed attorney, presumably Levin, the power to settle her cause of action and endorse any checks or releases.

Levin settled Johnson's claim for $3,500 in January 1983 but did not obtain her consent before agreeing to the offer. The settling insurance company released a check to Levin and he deposited it to his client trust account by simulating Johnson's signature. He also sent the insurance company a release bearing the alleged signature of Johnson as witnessed by himself and his secretary. With the release he sent a letter stating that the document was witnessed rather than notarized because no notary had been available when Johnson signed it.

Levin did not immediately inform Johnson that her case had been settled or release the settlement funds to her. Instead, after deducting his legal fees and paying Johnson's medical expenses out of the settlement proceeds, he gave $650 in cash to Hayes and asked him to deliver the money to Johnson. Levin believed that Hayes would see Johnson shortly and believed that he could be trusted with Johnson's funds because it was he who referred Johnson to the Levin office. Hayes did not give Levin a receipt.

Levin now concedes that the transaction with Hayes was a highly unorthodox and improper manner of payment. He insists that at the time he released Johnson's settlement proceeds to Hayes he was under extreme pressure to distribute settlements to his clients because of a theft of approximately $50,000 worth of settlement drafts from his office mail. He claims that his entire office was disrupted by the theft and that it was a uniquely stressful time in his practice. Although Johnson's check was not among those stolen, Levin maintains he gave Hayes the cash in an effort to settle the matter quickly so that he would have one less claim pending during that hectic period.

Johnson learned her case had been settled only when Harris told her that Levin had given Hayes the settlement proceeds. When Johnson asked

Hayes for her money he gave her $400 and kept the balance, claiming she owed it to him for a past debt. Neither Levin nor Hayes told Johnson the total amount of the settlement. Afterwards Johnson spoke directly with Levin, who informed her that her case had been settled and that she should contact Hayes to obtain the settlement. He promised to provide Johnson with a copy of her settlement check as well as an accounting of the disbursement of the settlement funds, but failed to keep this promise. He did not pay Johnson the balance of the amount owing to her or otherwise explain the disbursement of the settlement funds until after he had been notified that Johnson had filed a complaint with the State Bar. After he was informed of the complaint, Levin paid Johnson an additional $650 in complete settlement of her claim.

## II. STATE BAR PROCEEDINGS

The State Bar instituted formal proceedings against Levin on May 25, 1984, by issuing two notices to show cause for his conduct in the Hobbs and Johnson matters. The matters were consolidated and Levin was served on January 8, 1985. Two mandatory settlement conferences were held and the parties agreed on a tentative settlement. The hearing panel approved a stipulation as to facts and discipline in June 1985. In the stipulation the panel did not recommend any period of actual suspension, but this recommendation was rejected by the review department as too lenient. In September 1986 the hearing panel filed a first amended stipulation that was identical to the original stipulation except that it contained a recommendation that Levin be placed on probation for two years and be actually suspended for thirty days.

In its review of the hearing panel's decision the review department adopted the findings of fact and conclusions of law contained in the first amended stipulation. The panel and the department concluded that as a result of his conduct in the Hobbs matter, Levin willfully failed to employ such means as are consistent with the truth and willfully attempted to deceive opposing counsel and the court by false statements of fact. His conduct thus violated Business and Professions Code[1] sections 6068, subdivision (d),[2] and 6106,[3] as

---

[1] All statutory references are to the Business and Professions Code.

[2] Section 6068, subdivision (d), provides that it is the duty of an attorney "[t]o employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by any artifice or false statement of fact or law."

[3] Section 6106 states, inter alia: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

well as rule 7-105(1)[4] of the Rules of Professional Conduct.[5] In addition, both the hearing panel and the department found that Levin willfully communicated with a party whom he knew to be represented by counsel, in violation of rule 7-103.[6]

In the Johnson matter the department concluded, on the basis of the stipulation filed by the hearing panel, that Levin wilfully settled Johnson's personal injury claim without her knowledge or consent and wilfully failed to deliver the settlement funds in his possession or provide a proper accounting of disbursements. His conduct thus contravened sections 6068, subdivision (m)[7] and 6103.5, subdivision (a),[8] as well as rules 5-105[9] and 8-101(B), paragraphs (1), (3) and (4).[10] Further, the department relied on the stipulation to find that Levin willfully misrepresented to the settling insurance company that Johnson had personally signed a release, thus again violating the prohibition on deceptive acts contained in sections 6068, subdivision (d), and 6106, as well as rule 7-105(1).

While the review department adopted the findings of fact and conclusions of law contained in the first amended stipulation, it reached a different conclusion concerning discipline. The department recommended that Levin be suspended from the practice of law for three years, with execution of the suspension stayed on the condition that he actually be suspended for the

---

[4] Rule 7-105(1) provides in relevant part: "In presenting a matter to a tribunal, a member of the State Bar shall: (1) Employ for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and shall not seek to mislead the judge, judicial officer or jury by an artifice or false statement of fact or law."

[5] All rule references are to the Rules of Professional Conduct unless otherwise noted.

[6] Rule 7-103 provides, inter alia: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel."

[7] Section 6068, subdivision (m), states that an attorney must "respond promptly to reasonable status inquiries of clients and . . . keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services."

[8] Section 6103.5, subdivision (a), provides in relevant part: "A member of the State Bar shall promptly communicate to the member's clients all amounts, terms and conditions of any written offer of settlement made by or on behalf of an opposing party."

[9] Rule 5-105 establishes, inter alia, that "A member of the State Bar shall promptly communicate to the member's clients all amounts, terms, and conditions of any written offer of settlement made by or on behalf of an opposing party."

[10] Rule 8-101(B), provides, inter alia: "A member of the State Bar shall: (1) Promptly notify a client of the receipt of his funds, securities, or other properties.
 " . . . . . . . . . . . .
"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the member of the State Bar and render appropriate accounts to his clients regarding them . . .
"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the member of the State Bar which the client is entitled to receive."

first six months. It reached this conclusion because it concluded that Levin's conduct in the Hobbs and Johnson matters demonstrated a pattern of misconduct arising out of a series of dishonest transactions.

## III. DISCUSSION

There is no question that Levin's acts of dishonesty and his careless handling of his client's affairs violated the high ethical standards that members of the bar are expected to maintain. The record discloses numerous acts that contravene the express prohibitions of the Business and Professions Code and the Rules of Professional Conduct. Levin communicated with a party whom he knew to be represented, settled his client's case without her permission, and carelessly reported on the status of his client's case. Yet no aspect of Levin's conduct is more reprehensible than his acts of dishonesty. These acts manifest an "abiding disregard of ' "the fundamental rule of ethics—that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice." ' [Citation.]" (*Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 679-680 [244 Cal.Rptr. 462, 749 P.2d 1317], quoting *Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 577 [119 Cal.Rptr. 335, 531 P.2d 1119].) Such dishonest acts are grounds for suspension or disbarment, even if no harm results. (§ 6106; *Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 917 [180 Cal.Rptr. 831, 640 P.2d 1106]; Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 2.3.)[11]

Levin admits all the above acts and concedes that he has departed from the professional standards of conduct. ■ His sole contention is that the recommended discipline is too harsh in light of his conduct, the mitigating factors, and our previous decisions. Consequently we must decide whether the recommended discipline is necessary to protect the public, the profession, and the courts. (*In re Nadrich* (1988) 44 Cal.3d 271, 276 [243 Cal.Rptr. 218, 747 P.2d 1146].)

■ In reviewing the disciplinary recommendation of the State Bar the burden is on Levin to show that the recommendation is erroneous. (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 746 [111 Cal.Rptr. 905, 518 P.2d 337].) We give great weight to the department's disciplinary recommendations. (*Rossman* v. *State Bar* (1985) 39 Cal.3d 539, 545 [216 Cal.Rptr. 919, 703 P.2d 390].) Nevertheless, the ultimate decision on discipline rests with this court. (*Hunniecutt* v. *State Bar* (1988) 44 Cal.3d 362, 373 [243 Cal.Rptr. 699, 748 P.2d 1161].) We must independently examine the record and exercise our own judgment as to the appropriate discipline (*Lawhorn* v.

---

[11] All further references to standards are to these standards.

*State Bar* (1987) 43 Cal.3d 1357, 1365 [240 Cal.Rptr. 848, 743 P.2d 908]), especially when, as here, the review department and the hearing panel disagree (*In re Nadrich, supra,* 44 Cal.3d at p. 276).[12]

■ In light of section 6106 and the State Bar's disciplinary standards,[13] it is clear that Levin could be suspended from the practice of law as a result of his dishonest conduct in the Hobbs and Johnson matters. ■ Still, neither that section nor the standards prescribe a specific period of suspension. Thus, in arriving at the appropriate period of suspension we must balance all relevant factors, including aggravating and mitigating circumstances. (*Schneider* v. *State Bar* (1987) 43 Cal.3d 784, 798 [239 Cal.Rptr. 111, 739 P.2d 1279].) ■ A review of all such factors leads us to conclude that the department was correct in increasing the period of actual suspension as a result of the factors in aggravation of Levin's conduct.

Levin maintains that although the department recognized a number of mitigating circumstances here, by increasing the term of his suspension it did not adequately weigh the mitigating factors. First, he has been a member of the bar for 18 years and has no prior record of discipline. Given his substantial years of practice the absence of a prior record of discipline is a mitigating factor. (*Waysman* v. *State Bar* (1986) 41 Cal.3d 452, 457 [224 Cal.Rptr. 101, 714 P.2d 1239].) Second, Levin points out that these proceedings have been pending against him for over three years, he has been prejudiced by the delay, and such a delay merits consideration as a mitigating factor. (*Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 703 [108 Cal.Rptr. 806, 511 P.2d 1158]; standards, std. 1.2(e)(ix).) Further, he asks us to consider his conduct subsequent to the period in question in determining the appropriate discipline (*Waysman* v. *State Bar, supra,* 41 Cal.3d at p. 458; standards, std. 1.2(e)(viii)), i.e., since the State Bar began its investigation he has demonstrated an ability to adhere to acceptable standards of professional behavior, has had no further complaints filed against him, and has tried to reform the practices which gave rise to this complaint. Finally, Levin would have us favorably note that throughout the proceedings he has displayed candor and cooperated with the State Bar, as evidenced by his determination to stipulate to the relevant facts despite his counsel's objec-

---

[12] We note that the review department's recommendations regarding discipline must be given greater weight than those of the hearing panel. (*Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131 [192 Cal.Rptr. 866, 665 P.2d 956]; *Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35].)

[13] Because the hearing panel filed the first amended stipulation on August 1, 1986, we may rely on the disciplinary standards for attorney sanctions that became effective on January 1, 1986. The standards are not binding on us but we may nonetheless consider them in assessing the appropriate sanctions for misconduct. (*Segal* v. *State Bar* (1988) 44 Cal.3d 1077, 1087 [245 Cal.Rptr. 404, 751 P.2d 463].)

tions. He claims that his cooperation is another factor in mitigation. (*Rosenthal* v. *State Bar* (1987) 43 Cal.3d 658, 664 [238 Cal.Rptr. 394, 738 P.2d 740]; standards, std. 1.2(e)(v).)

All these mitigating circumstances, however, were recognized by both the panel and the department. Nevertheless, the department concluded that these circumstances were outweighed by aggravating factors that justified an increase in the recommended discipline. We agree.

The hearing panel and the review department concurred in finding that Levin's attempts to conceal his dishonest acts constituted one factor in aggravation of his misconduct. (Standards, std. 1.2(b)(iii).) In both the Hobbs and Johnson matters Levin offered a false document as though it were genuine and then tried to cover up his wrongdoing. At one point in the Hobbs matter Levin went so far as to try to submit perjured documents to a court. The department was correct in concluding that Levin's ethical violations were aggravated by his dishonest attempts to conceal this wrongful conduct. (See *Olguin* v. *State Bar* (1980) 28 Cal.3d 195, 200 [167 Cal.Rptr. 876, 616 P.2d 858].)

Moreover, the review department recommended an increase in discipline because it concluded that in addition to his efforts to conceal his dishonest acts, Levin's misconduct evinced a pattern of wrongdoing and demonstrated a "significant disregard of the practices designed to seek truth in legal matters." When "the current misconduct found or acknowledged by the member evidences multiple acts of wrongdoing or demonstrates a pattern of misconduct," the department may consider these multiple acts in aggravation of Levin's conduct. (Standards, std. 1.2(b)(ii).) Here the department was correct in finding such aggravating circumstances. Levin's ethical violations in the Hobbs matter were similar to his wrongful conduct in the Johnson case; in both matters he was dishonest, evasive, and contemptuous of his oath as an attorney. While these acts may not actually constitute a pattern of wrongdoing,[14] at the very least they demonstrate repeated, similar

---

[14] We have not had many occasions to explain what constitutes a pattern of misconduct by an attorney. In our prior cases we have held that only the most serious instances of repeated misconduct over a prolonged period of time could be characterized as demonstrating a pattern of wrongdoing. (See *Lawhorn* v. *State Bar, supra,* 43 Cal.3d 1367.) Thus, in *Garlow* v. *State Bar* (1989) 44 Cal.3d 689 at page 711 [244 Cal.Rptr. 452, 749 P.2d 1307], we held that a pattern of misconduct was evident when an attorney repeatedly made false representations to courts and misappropriated client funds in three separate matters. On the other hand, in *Olguin* v. *State Bar, supra,* 28 Cal.3d 195, we stated that although an attorney was guilty of giving false information to a government agency on two separate occasions, the deceptive conduct "may not depict a continuous course of conduct over an extended period of time to deceive governmental agencies." (*Id.* at p. 201.) The similarities between *Olguin* and this case might lead us to differ with the department's characterization of Levin's misconduct. But for the purposes of determining aggravation the result is the same whether Levin's conduct is

acts of misconduct which the department could properly consider in aggravation of his conduct. Although the standards discourage separate punishments for each of the wrongful acts,[15] these multiple violations may be weighed as an aggravating factor which, in our opinion, merits the period of actual suspension recommended by the department.

Because we give the department's recommendation great weight, it is apparent that Levin has failed to meet his burden of demonstrating that the department erroneously weighed the aggravating circumstances present in this case. We are not convinced that we should ignore his misconduct simply because mitigating circumstances are present. The admitted acts of dishonesty and carelessness merit the period of actual suspension that the department recommended.

Finally, Levin contends the recommended discipline is excessive compared to that imposed in other cases. ██ However, the imposition of discipline does not issue from a fixed formula. Each case must be decided on its own merits based on a balanced consideration of all relevant factors. (*Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 24 [184 Cal.Rptr. 720, 648 P.2d 942].) While we may consider the discipline imposed in previous, similar cases in arriving at the appropriate sanction, past disciplinary practices are not binding on this court. (*Beery* v. *State Bar* (1987) 43 Cal.3d 802, 816 [239 Cal.Rptr. 121, 739 P.2d 1289].) ██ Consequently, a review of all the aggravating and mitigating circumstances herein leads us to conclude that a six-month suspension from the practice of law followed by an extended period of probation is appropriate when, as in this case, an attorney has committed various acts of deceit and carelessness evidencing a consistent disregard of the truth.

Accordingly, we order that Levin be suspended from the practice of law for the period of three years, that execution of the order of suspension be stayed and that he be placed on probation for the period of three years upon the following conditions: 1. He shall be actually suspended from the practice of law in the State of California for the first six months of the period of probation.

---

characterized as multiple acts of wrongdoing or as a pattern of misconduct. (See Standards, std. 1.2(b)(ii).)

[15] If two or more acts of professional misconduct are found or acknowledged in a single disciplinary hearing, the standards provide that the sanction to be imposed should not be cumulative but should instead be the more severe of the different applicable sanctions. (Standards, std. 1.6(a).) Because these matters were consolidated and we have yet to impose discipline in either case, we must view these proceedings as a single disciplinary hearing for the purpose of considering increased discipline. (See *Natali* v. *State Bar* (1988) 45 Cal.3d 456, 468-469 [247 Cal.Rptr. 165, 754 P.2d 211].)

2. During the period of probation, he shall comply with the provisions of the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the additional conditions of probation set forth in the review department's disciplinary recommendations.

3. Within one year of the effective date of this order, he shall take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners.

4. He shall comply with rule 955 of the California Rules of Court and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively, after the effective date of this order.

This order is effective on the finality of this opinion.