[No. S011229. Apr. 15, 1990.]

MARGARET E. READ, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

404

COUNSEL

Kenneth Kocourek and Arthur L. Margolis for Petitioner.

Diane C. Yu, Richard J. Zanassi and Erica Tabachnik for Respondent.

OPINION

**THE COURT.**—The Review Department of the State Bar Court recommends that petitioner Margaret E. Read be disbarred from the practice of law and that she be ordered to comply with rule 955, California Rules of Court. We will impose the recommended discipline.

Petitioner was admitted to the practice of law in California in December 1975. In August 1985, the State Bar issued an eight-count notice to show cause. The parties later stipulated to the consolidation of additional counts, and a hearing, covering 18 counts, was held in December 1986. A supplemental hearing on mitigation was held in January 1988. In September 1988, the hearing panel, consisting of one referee, issued its findings. Two counts were dismissed at the request of the State Bar. The referee found miscon-

duct in each of the remaining 16 counts and recommended disbarment. The review department, after amending the hearing panel's findings, likewise voted (13 to 2) for disbarment. One of the dissenting members contended that the review department gave insufficient weight to the mitigating evidence.

Petitioner challenges the sufficiency of the evidence to support the findings in 10 of the 16 counts. We discuss below all counts, contested and uncontested. Petitioner also claims the discipline is excessive and disproportionate in light of the offenses committed and the factors in mitigation.

## I. SUFFICIENCY OF THE EVIDENCE

In considering a State Bar disciplinary recommendation, we independently review the evidence to determine its sufficiency. (*Rose* v. *State Bar* (1989) 49 Cal.3d 646, 651 [262 Cal.Rptr. 702, 779 P.2d 761].) In doing so, we accord great deference to the findings of the State Bar Court, especially when based on evaluations of credibility. (*Ibid.*) Petitioner may satisfy her burden of demonstrating that the findings are erroneous by showing that the charges are not sustained by convincing proof to a reasonable certainty. (*Ibid.*) If there is conflicting testimony, petitioner's mere repetition of her version of events may not meet her burden. (*Van Sloten* v. *State Bar* (1989) 48 Cal.3d 921, 931 [258 Cal.Rptr. 235, 771 P.2d 1323].) For each count, we will set forth the findings of the State Bar Court as determined by the review department and, when appropriate, analyze petitioner's claims in light of the foregoing rules.

As an initial matter, petitioner challenges many of the findings that she violated Business and Professions Code section 6103, which prescribes discipline for violating one's oath or duties as an attorney.[1] With the exception of a wilful violation of a court order, "this section does not define a duty or obligation of an attorney but provides only that violation of [her] oath or duties defined elsewhere is a ground for discipline"; thus petitioner could not violate section 6103 unless she violated a court order. (*Baker* v. *State Bar* (1989) 49 Cal.3d 804, 815 [263 Cal.Rptr. 798, 781 P.2d 1344]; *Sugarman* v. *State Bar* (1990) 51 Cal.3d 609, 618 [274 Cal.Rptr. 246, 798 P.2d 843].) Therefore, the discussion below will not address purported violations of section 6103 on a count-by-count basis when the "violation" was merely appended to a finding that a duty was breached. All such references to the review department's findings concerning this section have been stricken.

---

[1] All section references are to the Business and Professions Code unless otherwise indicated.

A. *The Mason Matter*

Petitioner was retained by Patricia Mason in May 1981 to represent her in a marital dissolution action. As part of the distribution of the net proceeds from the sale of the Mason home, the parties agreed that the escrow company would disburse $4,094.71 to petitioner, who would hold the money in her trust account. In October 1981, the escrow agent disbursed the money to petitioner, but she failed to deposit it in her trust account. Instead, she commingled it with her own funds and misappropriated it to her own use.

Mason then had difficulty contacting petitioner, whose telephone had been disconnected. When Mason finally succeeded, she could not persuade petitioner to disburse the money. In February 1982, Mason retained another lawyer to obtain the money from petitioner and to complete the dissolution. He obtained Mason's file from petitioner and sent two letters in June 1982, requesting that petitioner transfer the money. Petitioner failed to respond to either letter.

In August 1982, opposing counsel representing Mason's husband moved the court to join petitioner in the underlying dissolution action and order her to disburse the money. Petitioner failed to appear at the hearing, and the court issued the requested order.

In September, Mason's new attorney complained to the State Bar, and about 10 days later opposing counsel sought a writ of execution. Petitioner disgorged the money the next day.

Based on these findings the State Bar Court concluded petitioner committed acts and omissions of moral turpitude and violated section 6068 and former rules 6-101, 8-101, and 2-111(A)(3) of the Rules of Professional Conduct.[2]

 Petitioner's sole contention regarding this matter is that the findings incorrectly suggest that she made restitution only after she was informed

---

[2] Unless otherwise indicated, all rule references are to the former Rules of Professional Conduct of the State Bar of California, operative until May 27, 1989.

Petitioner may have wilfully violated a court order in this matter, which would constitute a violation of section 6103. The State Bar Court found a violation of that section. As discussed above, however, the State Bar Court improperly found numerous violations of section 6103. Because it is unclear whether the State Bar based its section 6103 finding on a wilful violation of a court order, or whether, as in later matters discussed below, it simply followed a practice of appending section 6103 to other violations, we do not rely on the finding in determining the appropriate discipline.

that a complaint had been made to the State Bar. According to petitioner, she made restitution before she received notice of the complaint.

We disagree that the findings are misleading. But even assuming they are misleading, the fact that petitioner made restitution before being notified of the complaint is of little consequence when compared to her other misconduct in this matter: the numerous unsuccessful demands made by her client, Mason's new attorney, and opposing counsel; the fact that it took petitioner over a year to make restitution; and that eventually the court had to issue an order to disburse the money after opposing counsel felt compelled to join petitioner in the dissolution action.

We therefore conclude that sufficient evidence supports the findings of the State Bar Court.

### B. *The Reed Matter*

As part of her representation of Judith Reed, petitioner subpoenaed records from Ontario Savings and Loan. On August 19, 1982, she paid the bank for its services with a check for $51.30 drawn on her trust account, knowing she had insufficient funds to cover it.[3]

The State Bar Court found petitioner commingled funds in violation of section 6068 and rule 8-101 and committed acts and omissions involving moral turpitude.

█ We conclude insufficient evidence supports the conclusion that petitioner commingled funds. Although the record demonstrates that the account contained insufficient funds to cover the check, it does not show petitioner ever received the funds meant to be disbursed by the check. She could not commingle money she never received.

Petitioner urges us to strike the finding that she wilfully issued the check knowing that the funds were insufficient to cover it, claiming the notice to show cause did not include such a charge. We reject the claim. █ "To be sure, the State Bar cannot impose discipline for any violation not alleged in the original notice to show cause. . . . Yet adequate notice requires only that the attorney be fairly apprised of the precise nature of the charges before the proceedings commence. Unless the petitioner demonstrates that [her] defense was actually compromised, a slight variance [does not deprive her of adequate notice]." (*Van Sloten* v. *State Bar, supra,* 48 Cal.3d 921,

---

[3] Petitioner made restitution to the bank the day before the hearing in the review department.

928-929.) ■ In the State Bar's prehearing brief, containing a summary of the facts and charges in each case, the bar claimed that petitioner violated section 6106, i.e., that she committed an act of moral turpitude with respect to this count. Petitioner received a copy of this statement and therefore was on notice that she was charged with an offense involving moral turpitude. Knowledge that a check was issued without sufficient funds is an integral element of a charge of moral turpitude premised on writing a bad check. (See *Rhodes* v. *State Bar* (1989) 49 Cal.3d 50, 60 [260 Cal.Rptr. 266, 775 P.2d 1035].) Having notice that she was charged with moral turpitude in the context of writing a bad check, petitioner had sufficient notice that she was charged with knowingly writing such a check.

C. *The Hopkins Matter*

In August 1982, petitioner hired Herbert Hopkins, a certified public accountant, to assist her by appraising assets in conjunction with a marital dissolution she was handling. Petitioner paid Hopkins $125 with a check from her client trust account. The bank did not honor the check because there were insufficient funds to cover it. Hopkins called petitioner to inform her that the check was rejected. Petitioner maintained the check was good, but agreed to send him another check. Later, Hopkins called petitioner and told her that he had not received the new check. She promised to take care of it immediately. Thereafter Hopkins's secretary called and was told the check was in the mail. Hopkins again called petitioner, who claimed to have already mailed the check. As of the date of the proceedings before the hearing panel, Hopkins had not been paid.[4]

Based on the foregoing, the State Bar Court concluded petitioner wilfully and knowingly made false representations to Hopkins and his secretary; that she wilfully gave Hopkins a check knowing there were insufficient funds to cover it; that she commingled and misappropriated client funds; that she committed acts and omissions of moral turpitude; and that she violated section 6068 and rules 6-101 and 2-111(A)(3).

■ Petitioner points to a variance between the notice to show cause, which charged only commingling, and the findings, which include a determination that she misappropriated client funds, and argues that the variance requires striking the finding of misappropriation. We agree. ■ As discussed above, due process requires that petitioner be disciplined only for violations charged in the original notice to show cause. (*Van Sloten* v. *State Bar, supra,* 48 Cal.3d at p. 928.) If evidence at the hearing establishes an

---

[4] Petitioner made restitution to Hopkins on the day before the hearing in the review department.

ethical or professional violation not charged in the original notice, the State Bar must amend the notice to conform to the evidence. (*Id.* at pp. 928-929.) ■ The State Bar failed to amend the notice prior to decision and, having examined the record, we conclude that nothing in the pleadings and papers sent to petitioner gave her notice. We therefore strike the finding of misappropriation.

Additionally, we strike the finding of commingling. The record with respect to this count suffers from the same deficiency as the record in the Reed matter. There is no evidence petitioner's client in this matter actually gave her money for the payment of this expense. Without evidence that petitioner ever received the money, we cannot conclude that she commingled it with other funds.

Petitioner again contends the finding that she wrote the check knowing the account contained insufficient funds must be stricken because of the resulting variance between it and the notice to show cause, which did not charge her with such knowledge. For the reasons discussed above in the Reed matter, we disagree.

■ Additionally, petitioner claims that rules 6-101 and 2-111(A)(3) are inapplicable. We agree. By its terms, rule 6-101 requires that an attorney not perform services if she does not possess the requisite degree of learning and that she use reasonable diligence and her best judgment to accomplish the purpose for which she is employed. It seems evident that a mere failure to pay one provider of services does not establish a violation of the rule. We therefore strike the finding that petitioner violated this rule.

The conclusion that petitioner violated rule 2-111(A)(3) suffers from two defects. First, the rule deals with refunding unearned fees. The funds at issue, however, were not fees but advances for payment of expenses incurred during the representation. As such they were outside the scope of rule 2-111(A)(3). Second, as noted above the record does not indicate petitioner received the funds. She could not, therefore, return them. We therefore strike the finding that petitioner violated rule 2-111(A)(3).

D. *The Nelson Matters*

1. *Acquiring an adverse interest*

In January 1981, Phyllis Nelson hired petitioner to represent her in the dissolution of her marriage. Petitioner required Nelson to sign a promissory note for $800, which petitioner estimated would be her fee. Additionally, petitioner had Nelson sign a deed of trust, naming petitioner as beneficiary,

to secure payment of the promissory note. Petitioner assured Nelson the deed would not be recorded or used. Nelson signed the deed of trust in reliance on this representation. Petitioner, however, recorded the deed in February 1981. She did not inform Nelson that she was acquiring an adverse interest in the property. Moreover, petitioner did not advise Nelson to consult with an independent attorney, nor did she obtain written consent from Nelson. Based on the foregoing, the State Bar Court found the terms of the deed were neither fair nor reasonable and concluded petitioner violated section 6068 and rules 5-101, 6-101, and 2-111(A)(3).

■ Petitioner contends the evidence, especially when considered in light of her testimony, fails to establish that she told Nelson she would not "record" the deed. Rather, she asserts she merely told Nelson she would not "use" the deed. As we stated above, we accord great weight to the findings of the State Bar Court, especially when the issue turns on credibility. Petitioner merely attacks the credibility of other witnesses and asks us to believe her version of events. We will not disturb this finding.

■ Petitioner argues the State Bar Court improperly based its conclusion, that the transaction violated the portion of rule 5-101 prohibiting transactions that are not fair and reasonable to the client, on petitioner's violation of other requirements of the rule. Her claim, however, does not diminish the fact that she violated that rule. A violation of any part of the rule is sufficient to constitute misconduct. At best petitioner can show only that she committed *most* of the conduct that is prohibited by the rule, but that suffices.

Petitioner asserts that until our decision in *Hawk* v. *State Bar* (1988) 45 Cal.3d 589 [247 Cal.Rptr. 599, 754 P.2d 1096], it was unclear that taking a deed of trust was subject to the requirements of rule 5-101. Therefore she argues that her failure, prior to 1988, to comply with the rule did not reflect bad faith. Lack of bad faith, however, does not preclude the finding. As in *Hawk*, we recognize "the fact that we have not previously held that an attorney who takes a note secured by a deed of trust automatically acquires an interest 'adverse' to his client . . . make[s] petitioner's conduct in this matter less reprehensible than would be a violation of a more clear-cut and well-established rule." (45 Cal.3d at p. 602.) Any lack of bad faith merely goes to the seriousness of the violation, not its existence, and we thus conclude that petitioner violated rule 5-101.

■ Next, petitioner submits that rules 2-111(A)(3) and 6-101 are inapposite to this matter. We agree. Demanding and recording a deed of trust do not establish a failure to refund a fee, nor do they support a finding that petitioner failed to give competent representation.

Finally, we note that the hearing panel found that petitioner's representations about the deed were false and made in a manner calculated to deceive Nelson, and that Nelson was thereby defrauded. The hearing panel also found that the petitioner's acts and omissions constituted moral turpitude. ▉ The review department struck the finding regarding moral turpitude but left intact the findings related to fraud. Apparently, the review department agreed with the hearing panel that petitioner engaged in fraudulent misrepresentation. "Any crime or misconduct reflecting dishonesty, particularly when committed in the course of practice, is . . . conduct involving moral turpitude for purposes of State Bar disciplinary proceedings." (*Baker v. State Bar* (1989) 49 Cal.3d 804, 815-816, fn. 3 [263 Cal.Rptr. 798, 781 P.2d 1344].) Petitioner's misrepresentations constitute dishonesty committed during practice and, thus, moral turpitude. We therefore readopt the finding of moral turpitude.

### 2. *Withdrawal*

Nelson was displeased with petitioner's performance after the first day of trial in May 1981. Petitioner told Nelson she would try to find substitute counsel because she did not feel capable of handling the case. Nelson did not discharge petitioner and expected her to appear in court the next day. Petitioner did not tell her otherwise. The next day, however, petitioner wilfully failed to appear and wilfully failed to inform Nelson or the court that she would not be appearing.

Nelson called petitioner five minutes before the trial was to resume. Petitioner had no satisfactory explanation why she was at her office, which was 45 minutes away. Nelson told petitioner that she might as well stay at the office. Petitioner immediately called the trial judge and told him that she had been discharged. In open court, Nelson denied discharging petitioner and obtained a continuance. Nelson retained new counsel to conclude the case, but he was not allowed to explore areas petitioner had already covered, resulting in prejudice to Nelson.

▉ Petitioner's representations to the court were false, and she knew them to be false. She wilfully withdrew without the consent of her client or the approval of the court and without taking reasonable steps to avoid causing foreseeable prejudice to Nelson. She wilfully failed to provide reasonable notice to her client and an adequate opportunity for the client to employ other counsel to properly conclude the case. The State Bar Court concluded petitioner committed acts and omissions involving moral turpitude and violated section 6068 and rules 6-101 and 2-111(A)(2).

Petitioner, quoting her testimony at the hearing, posits that she reasonably believed she had been fired. She does little more than ask us to accept

her version of events. The State Bar Court reasonably could have concluded that petitioner's testimony was not credible and that other credible testimony did not support an inference that she had been discharged. Petitioner has failed to meet her burden of showing that convincing proof does not support the findings.

Petitioner also disputes the finding that Nelson suffered prejudice, arguing there is no evidence petitioner would have been allowed to explore areas already tried, had there been no substitution of counsel. Because the new attorney was hampered to the same extent she would have been, petitioner concludes there was no prejudice to her client. We need not concern ourselves with the existence of actual prejudice. Rule 2-111(A)(2) requires an attorney to take certain steps to avoid foreseeable prejudice. It is axiomatic that withdrawing without notice in the middle of trial usually results in foreseeable prejudice. Because petitioner failed to act to avoid foreseeable prejudice we conclude that she committed the violations found by the State Bar Court.

3. *Protecting property*

In May 1981, petitioner attempted to sell the Nelson note and deed of trust. She did not account to Nelson for any of the fees or costs she assertedly was owed, which she sought to recover by selling the note.

The State Bar Court concluded petitioner wilfully failed to maintain records or render an accounting and that she wilfully failed to maintain the security and property of her client in a safe place, protected against unauthorized use. She therefore was found to have violated section 6068 and rule 6-101. ▮▮▮ As already discussed, rule 6-101 requires an attorney to give competent representation. It does not, however, require an attorney to render an accounting or to protect client property. We therefore do not adopt the conclusion that petitioner's failings constituted a violation of rule 6-101. Because we conclude below that petitioner breached her fiduciary duties in this matter, however, we discuss petitioner's other arguments.

▮▮▮ Petitioner contends that the only evidence of her attempt to sell the note and the deed was hearsay evidence admitted solely to show her state of mind. Our review of the record reveals that the attempt to sell was established by evidence other than that referred to by petitioner.[5]

---

[5] The transcript discloses the following:

"The Referee: Did Barbara Rose [petitioner's secretary] ever tell you that Ms. Read had offered your deed of trust for sale to somebody else?

"[Nelson]: Yes."

Petitioner earlier acknowledged that statements by her secretary could be treated as admissions against interest by an agent. The statement was admissible as an exception to

 Petitioner asserts no evidence supports the finding that she failed to (1) account for her time or costs and (2) maintain records of property and security held for Nelson. Nelson testified that she was not billed by petitioner, which supports the finding that petitioner failed to account for her time or costs. Because no evidence supports the finding that petitioner failed to maintain records of the security held by her, we strike that finding.

Petitioner contends the finding that she failed to protect the property and security of a client is inappropriate because the note and deed of trust belonged to her, not Nelson. As an initial matter, we note that by attempting to sell the note and the deed, petitioner failed to protect the property to which the note and deed attached. Moreover, focusing solely on the note and the deed, the critical element of the finding is that petitioner failed to protect them. The existence of misconduct does not turn on ownership. Had petitioner received an advance payment for costs and expenses for work not yet done, she would have been obligated to place the money in a trust account. (Rule 8-101(A).) The deed of trust and the note were not funds that could be deposited; therefore no violation of rule 8-101(A) occurred. (*Hartford* v. *State Bar* (1990) 50 Cal.3d 1139, 1151 [270 Cal.Rptr. 12, 791 P.2d 598] [pledged stock of third party held for benefit of clients not funds that could be deposited].)

Nonetheless, the note and deed of trust functioned as an advance for fees. Petitioner was not yet entitled to collect on the debt or to foreclose on the property, especially in light of her promise not to use or record the deed. In *Hartford* v. *State Bar*, 50 Cal.3d 1139, *supra*, we essentially construed section 6068, subdivision (a), to include a duty not to breach a fiduciary trust. We were confronted with an attorney who sold pledged stock after promising not to do so. "The circumstances under which he took possession of the pledged stock, including full knowledge of the terms of the pledge agreement (i.e., that the stock was not to be sold until the case was concluded), created a duty to [the pledgor] as well as to petitioner's clients." (50 Cal.3d at p. 1153.) Petitioner made a similar promise not to use the deed of trust. Under the circumstances, she therefore had a fiduciary duty not to use the deed in any way. Petitioner breached this duty when she attempted to sell the note and deed. Moreover, as a fiduciary, she had a duty to account for fees and costs to be charged against the note. Her failure to account breached this duty. (See *Ridge* v. *State Bar* (1989) 47 Cal.3d 952, 961 [254 Cal.Rptr. 803, 766 P.2d 569] [failure to account for entrusted funds is cause for discipline].)

Although the notice to show cause did not specify a breach of a fiduciary duty as the basis for discipline, we believe that petitioner had sufficient

---

the hearsay rule. Moreover, even if this exception were inapplicable in this instance, petitioner failed to object to this testimony and has thus waived any hearsay bar to its admission.

notice and that her defense to this count was not prejudiced. (See *Van Sloten* v. *State Bar, supra*, 48 Cal.3d at p. 929.) *Hartford* v. *State Bar, supra*, 50 Cal.3d 1139, reached the same conclusion on similar facts. There, the attorney was charged, inter alia, with breaching his duty to support the laws of the state (§ 6068, subd. (a)), moral turpitude (§ 6106), and a violation of rule 8-101(A). Moreover, the attorney had full notice of the alleged misconduct. Here, the State Bar's prehearing brief cited, inter alia, sections 6068 and 6106 and rule 8-101. Petitioner likewise had notice of the facts alleged to constitute the misconduct. "Substantial evidence supports an inference, at the very least, that petitioner's unlawful conduct violated [her] oath and duties as an attorney ([§ 6068, subd. (a)]). The finding as to [this count] is therefore sustained on that ground." (*Hartford* v. *State Bar, supra*, 50 Cal.3d 1139, 1154.)

### E. *The Mitchell Matter*

▆ In April 1984, Kathleen Mitchell paid petitioner $500 to handle an adoption matter. Petitioner subsequently moved and disconnected her telephone without providing Mitchell her new address or telephone number. Mitchell, through her own efforts, was able to locate petitioner's new office. But in August 1984, petitioner once again closed her office without notifying Mitchell. Because Mitchell was unable to locate petitioner, she represented herself in the adoption matter. Petitioner failed to return any of the fees Mitchell had advanced.[6]

The State Bar Court concluded that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3). We adopt these uncontested findings.

### F. *The Gambetty Matter*

▆ In September 1983, petitioner accepted a $350 retainer to represent Sherry Lee Gambetty in a dissolution of marriage. After performing some services and receiving an additional $275 from Gambetty, petitioner moved her office without notifying her client. Gambetty was able to discover petitioner's new office but was unsuccessful in her attempts to communicate with her. Gambetty, therefore, hired a new lawyer in July 1984. Petitioner never completed the case, nor did she refund any of the fee.[7]

The court determined that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3). We adopt these uncontested findings.

---

[6]In her declaration to the review department detailing restitution payments, petitioner states she has been unable to locate Mitchell and therefore has not made restitution to her former client.

[7]Petitioner paid $625 in restitution about a week before the hearing in the review department.

## G. *The Buckley Matter*

In November 1983, Michelle Ann Harris Buckley paid petitioner a $300 retainer to represent her in a marital dissolution. Petitioner asked Buckley whether her husband had ever committed an act of fraud in connection with the marriage. Buckley denied any fraud occurred. Petitioner told Buckley that it was in her best interest to petition for a declaration of nullity rather than dissolution and urged Buckley to testify falsely that her husband had not told her before marriage that he had had a vasectomy. Petitioner induced Buckley to file a petition for nullity premised on that fraudulent ground.

Within one week, Buckley, deciding that she could not perjure herself, changed her mind and refused to proceed. Petitioner charged her $100 for a minor amendment to the petition to conform it to a petition for dissolution, which was filed in November.

In February 1984, petitioner told Buckley that a final judgment could be obtained within six months of the filing of the petition. Petitioner knew that Buckley, based on that estimate, was planning to be married in June. Petitioner obtained an interlocutory judgment in May. Buckley proceeded with her wedding plans. Petitioner, however, failed to complete the dissolution and quit her offices without notifying Buckley. After cancelling the wedding and making numerous attempts to contact petitioner, Buckley succeed in reaching her in September. Although petitioner assured her that the dissolution would be completed, she failed to obtain the final judgment; Buckley retained new counsel who, in October, completed the case. Petitioner caused a three-month delay in Buckley's wedding and never refunded fees or reimbursed expenses.[8]

The State Bar Court determined that petitioner's acts and omissions constituted moral turpitude and that she violated section 6068 and rules 6-101 and 2-111(A)(3).

Petitioner attacks the credibility of various witnesses, quotes her own testimony extensively, and argues the record does not credibly support the finding that she induced or attempted to induce her client to commit perjury. As in prior counts, we decline petitioner's invitation to reassess the credibility of the witnesses and conclude that she has not sustained her burden of demonstrating that the findings are erroneous. We therefore adopt the conclusions of the State Bar Court.

---

[8] From the record, it appears no restitution was paid in this matter.

H. *The Ziegler Matter*

In March 1984, petitioner received a $500 retainer from James Ziegler to represent him in the adoption of his two stepchildren. He agreed to pay $500 more to complete the adoption. In April, Ziegler signed a petition of adoption with respect to one child. Two weeks later, petitioner called him and requested the balance of the fees. He paid her $250, leaving a $250 balance.

At the end of April, Ziegler called petitioner and discovered her phone was disconnected. He went to her office and found that she had moved, without giving him notice. Through his own efforts, he located her new office. He went there and spoke with petitioner's secretary, who told him to return with the $250 balance and additional documents that he had previously provided. In May, Ziegler paid the $250 balance.

In June, petitioner filed a petition for adoption pertaining to one child only. In July, Ziegler sent a certified letter, requesting a status report. Petitioner did not claim the letter. Ziegler then went to petitioner's new office and discovered that she had vacated it without giving him notice or a forwarding address. Ziegler hired a new attorney to complete the adoption. Petitioner never returned his files or fees.[9]

The court concluded that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3). Petitioner does not contest these findings, and we adopt them.

I. *The Simpson Matter*

In January 1984, Michael and Sheryl Simpson paid petitioner $100 to locate a New York divorce decree of Mr. Simpson. Petitioner was then to proceed with a dissolution of a prior marriage of Mrs. Simpson in California, to be retroactive to a date that would allow the Simpsons' current marriage to be valid and enable them to buy a home by November 1984.

In February 1984, after petitioner informed the Simpsons that she could not locate the New York decree, they paid her $300 and instructed her to proceed with the dissolution of Mrs. Simpson's prior marriage. In March, the last time the Simpsons spoke to her, petitioner told them the decree would be entered by October. Petitioner filed a petition for dissolution in May.

---

[9] About a week before the hearing in the review department, petitioner paid $739 in compensation on January 18, 1989, to the State Bar's client security fund to reimburse it for payments it made in this matter.

▆▆▆ The Simpsons had no further contact with petitioner. They discovered her phone was disconnected and her office closed. They obtained a "current address" from the State Bar, but the office at that location was also empty, except for a mailbox full of mail. The Simpsons never received a refund, and the dissolution decree was never obtained.

The Simpsons intended to arbitrate their resulting fee dispute with petitioner in September 1986. The arbitrator took the matter off calendar when petitioner called her and promised to send the Simpsons $400 within one week. As of the date of the proceedings before the hearing panel, petitioner had not paid the Simpsons.[10]

The State Bar Court concluded that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3). Petitioner does not contest these findings, and we adopt them.

J. *The Dammeier Matter*

In September 1983, Dieter Dammeier paid petitioner $1,200 to represent him in a dissolution of marriage. Petitioner prepared various responsive papers and eventually attempted to settle with opposing counsel. Petitioner was unable to settle the case and prepared to litigate.

▆▆▆ From March through part of May 1984, Dammeier had difficulty communicating with petitioner, whose phone was unanswered and whose office was empty. When he finally contacted her in May, she assured him that she was handling the case.

Petitioner attempted to file an at-issue memorandum but neglected to file a response to the underlying dissolution petition. The court therefore rejected the memorandum and eventually entered a default against Dammeier. After learning of the default, he contacted petitioner, who assured him that she would have the default set aside and had him sign papers seeking to do so.

Thereafter, opposing counsel obtained an uncontested interlocutory judgment in June. Petitioner failed to file a motion to set aside the default, even though she knew that the interlocutory judgment was extremely unfavorable to her client.

In June, petitioner vacated her office without notifying Dammeier, who was unable to locate her; he retained a new attorney who filed a motion to

---

[10] About a week before the hearing in the review department, petitioner paid the State Bar client security fund $291 to reimburse the fund for its payments to the Simpsons.

set aside the default on the July 27. The new attorney withdrew the motion because opposing counsel was able to contradict every material allegation that petitioner had made in a declaration in support of the motion.

As a result of the foregoing, Dammeier lost his business, valued at $60,000, and virtually his entire share of the community property and was subject to unfavorable support and custody orders. Dammeier retained another attorney to file a malpractice suit against petitioner. The suit was withdrawn because either Dammeier or the attorney believed that the action was stayed by petitioner's filing a petition in bankruptcy listing Dammeier as a creditor.

The State Bar Court determined that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3).[11]

Petitioner contends nothing in the record indicates that the motion to set aside the default was withdrawn because of the specified contradictions. She also asserts she never listed Dammeier as a creditor in her bankruptcy petition. Assuming petitioner is correct, setting aside those findings would not undermine the other findings or alter the ultimate conclusion that petitioner committed the ethical violations discussed above.

### K. *The Valdez Matter*

In December 1983, Kathy Valdez employed petitioner to represent her in a marital dissolution. Valdez paid petitioner a total of $900. Petitioner filed a petition and sought an order to show cause. The matter was taken off calendar when petitioner and Valdez failed to appear. In February 1984, Valdez and her husband signed a marital settlement agreement, but Valdez was never given a copy.

Thereafter, Valdez attempted unsuccessfully to communicate with petitioner, who did not return Valdez's calls. Eventually, petitioner's phone was disconnected, and she moved her office. For 10 days in June, Valdez tried to reach petitioner for advice regarding her husband's insistence that she sign a deed. Finally, she signed without advice of counsel and under duress, receiving $5,000 as her share of equity valued at between $10,000 and $15,000.

Petitioner obtained entry of the husband's default in July and set an uncontested hearing for October. Valdez, however, was never notified of the hearing date.

---

[11] About a week before the hearing in the review department, petitioner paid Dammeier $1,200 in restitution.

From July through October 1984 Valdez left over 50 messages for petitioner. Valdez wrote her a letter and received no reply. After she complained to the bar, Valdez met petitioner at a liquor store because petitioner had no office. Petitioner returned Valdez's files but did not sign a substitution of attorney form, although she promised to do so. Likewise, petitioner failed to refund any fees despite a promise to return $200.[12]

Petitioner told Valdez the default hearing was set for the next day. Valdez, however, did not want petitioner to represent her further. The hearing was continued, and Valdez substituted herself as her own attorney. Eventually, the court dissolved the marriage.

■■■ Petitioner contends there is evidence to support her claim that she informed her client of the October hearing. The testimony is ambiguous on this point, but petitioner has not persuaded us that the finding is incorrect. Even assuming she told Valdez about the hearing, the conclusion that petitioner violated section 6068 and rules 6-101 and 2-111(A)(3) is amply supported.

She also asserts her failure to refund the fees was not wilful and no evidence supports a contrary finding. In support, she points to her testimony in which she explained that she failed to refund the fees simply because she did not have the money. "Wilful violation of the Rules of Professional Conduct is established by a demonstration that the attorney ' "acted or omitted to act purposely, that is, that he knew what he was doing or not doing and that he intended either to commit the act or to abstain from committing it." ' " (*Phillips* v. *State Bar* (1989) 49 Cal.3d 944, 952 [264 Cal.Rptr. 346, 782 P.2d 587].) Petitioner had not earned the fees. The money therefore should have been available for refund. Petitioner's use of the funds, which thereby made it impossible for her to refund the fees, was a wilful act. The conclusions of the State Bar Court were appropriate, and we adopt them.

## L. *The Pizano Matter*

■■■ In March 1984, Norma Pizano retained petitioner to represent her in a marital dissolution. Pizano paid petitioner $200 at that time and an additional $119 in April. Thereafter, petitioner failed to perform any work on the case. She moved without notifying Pizano. Although Pizano located her, petitioner returned none of Pizano's calls. Petitioner moved a second

---

[12] About a week before the hearing in the review department, petitioner paid Valdez $900 in restitution.

time without notifying Pizano and failed to refund any of the fees advanced.[13]

Petitioner does not contest these findings or the finding of the State Bar Court that she violated section 6068 and rules 6-101(A)(2) and 2-111(A)(3), and we adopt them.

## M. *The Fernandez Matter*

Manuel Fernandez employed petitioner in August 1983 to represent him in a marital dissolution and to prepare his will. He paid her a total of $500 to perform both tasks. Petitioner prepared the will and proceeded with the dissolution, obtaining a decree of dissolution and an interlocutory judgment in April 1984. Fernandez did not see petitioner thereafter despite numerous unsuccessful attempts. He eventually acted on his own to enter a final judgment in the dissolution in August.

The State Bar Court concluded petitioner violated section 6068 and rules 6-101(A)(2) and 2-111(A)(3). Petitioner does not contest, and we adopt, the foregoing findings.[14]

## N. *The Javens Matter*

Verna Javens hired petitioner in January 1983 to probate the estate of her aunt. Petitioner charged an advance fee of $500 and stated there would be additional fees. Petitioner arranged these fee matters without seeking court approval.

In February, Javens asked petitioner to sell a mobilehome in connection with the estate. Petitioner agreed to do so expeditiously. By August, however, petitioner had not attempted to sell the home, which was rapidly depreciating. She attributed the delay to the failure of the court to issue letters testamentary. Yet, even after the issuance of such letters, petitioner failed to attempt to sell the home. During this period, Javens had difficulty contacting petitioner.

At the same time, Javens employed petitioner to sell her deceased aunt's property in Montana. Petitioner agreed to cooperate with Thomas Monaghan, a Montana attorney, and help him prepare the necessary documents. In February 1984, Monaghan asked Javens to induce petitioner to cooper-

---

[13] About a week before the hearing in the review department, petitioner paid the State Bar client security fund $319 to reimburse the fund for its payments to Pizano.

[14] About a week before the hearing in the review department, petitioner paid Fernandez $100 in restitution.

ate. Eventually, Monaghan withdrew because of petitioner's failure to cooperate.

Also in February, Javens went to petitioner's office to sign some papers. She was in the office for five and one-half hours; because petitioner failed to prepare the papers properly, Javens had to return several times. Petitioner charged Javens an additional $1,011 without court approval, which Javens paid immediately.

In April, Javens inquired why the estate had not been settled. Petitioner did not reply. Javens wrote again in August, requesting a substitution of attorney. Petitioner ignored this letter. Later, a paralegal told Javens that petitioner had employed her to complete the estate. Javens checked on the progress of the matter in December 1984, May 1985, and September 1985 and found the estate had not been closed. The paralegal explained that petitioner had not paid her for her services. Javens then offered to loan petitioner the money to pay the paralegal, who refused to take the money directly. Thereafter, Javens was notified that the estate had been closed in January 1986.

■■■ The State Bar Court concluded that petitioner's acts and omissions constituted moral turpitude and that she violated section 6068 and rules 2-107, 6-101, 2-111(A)(2), and 2-111(A)(3).[15]

Petitioner raises the following points: Monaghan did not request Javens's help to induce petitioner to cooperate; the appointment in February did not have to be repeated; and Javens's letter of August 4 was not ignored, as shown by petitioner's causing her paralegal to contact Javens. Even assuming the foregoing points are true, the remaining findings more than adequately support the State Bar Court conclusions, which we adopt.

## II. Propriety of Discipline

We begin by setting forth the well-established principles that guide this aspect of our review. ■■■ "[B]efore imposing any discipline, we must conduct an independent review and determine whether the recommended discipline is appropriate. Petitioner bears the burden of showing that the recommended discipline is inappropriate. In arriving at an appropriate discipline, we balance all relevant factors, including mitigating circumstances, on a case-by-case basis. The discipline ultimately imposed must be consistent with its purpose, that of protecting the public, the courts, and the legal

---

[15] The record does not show that petitioner has made restitution in this matter.

profession from unfit practitioners." (*In re Young* (1989) 49 Cal.3d 257, 266 [261 Cal.Rptr. 59, 776 P.2d 1021].)

## A. *Aggravation and Mitigation*

### 1. *Aggravating Circumstances*

■ We note, as did the State Bar Court, a panoply of aggravating circumstances. The foregoing acts and omissions demonstrate a pattern of misconduct involving a wide range of improper behavior: petitioner engaged in multiple acts of bad faith, dishonesty, concealment, and overreaching; she misappropriated funds, counseled a client to perjure herself, and made misrepresentations to the court; and she effectively withdrew from the representation of numerous clients without informing them or providing for their representation.

Further, petitioner significantly harmed clients and the administration of justice. One client, Dammeier, lost his business and most of his life's savings because of petitioner's representation. The administration of justice was damaged by her withdrawal in the Nelson matter and by her advance fee in the Javens matter without court approval.

Petitioner demonstrated indifference toward remedying the harm she caused and displayed a general lack of candor and cooperation to the courts and to the victims of her misconduct. On a number of occasions she refused to refund unearned fees or return files, and she failed to complete many of the foregoing cases. She withheld trust funds. Even after the proceedings in the hearing panel were completed, she waited one year—until the eve of the hearing before the review department—to reimburse some of the clients who suffered from her unethical and unprofessional behavior. And even today, some of her former clients still await reimbursement.

### 2. *Mitigating Circumstances as Found by the State Bar Court*

The State Bar Court found that petitioner suffered from a major depressive disorder at the time of some of the acts of misconduct and that her depression was directly responsible for some of the acts that occurred from February 1984 to 1987. Her recognition of the poor quality of some of her work and the closing of her office contributed to her depression. These problems were themselves attributable in part to her son's behavior problems, which included drug abuse, and to her extreme financial stress, caused in part by expending $35,000 to defend her son in various civil and criminal actions. The State Bar Court also determined that by late 1987 petitioner no longer suffered from emotional difficulties.

The findings of mitigation were tempered by the following conclusions of the State Bar Court. Petitioner's son's problems began before petitioner was admitted to the bar. Petitioner's failure to make restitution was not caused by financial problems. Rather, petitioner made little or no effort to locate clients and no effort to refund unearned fees. Further, the court found that petitioner failed to prove that she closed her office in order to protect her clients from poor representation. Rather, the court concluded that petitioner closed her office because she could not afford to remain open. Moreover, she failed to show that she was remorseful and her testimony was found to be incredible and inconsistent.

### 3. Petitioner's Discussion of Mitigation

Petitioner emphasizes her extreme family and emotional difficulties. Her children began experiencing severe emotional problems in 1974, when petitioner and her husband separated. Two sons were very violent toward each other. In addition, one son abused drugs, engaged in criminal activity and associated with "horrible people." As noted by the State Bar Court, her son's activities had a serious financial impact on petitioner. In addition to the $35,000 in legal fees she spent on her son, her fiscal problems affected her home life. The family went without electricity for four months, without gas for two months, and without phone service for six months. Eventually, in February 1984, she felt that she had to close her office because she was performing inadequately for her clients. When asked how she felt about these events, she replied, "[H]arassed. . . . Everything is crowding in on you, you know, and you are trying to cope with everything. . . ." In 1984, petitioner went to one session with a psychiatrist and spent three hours crying; she was financially unable to continue therapy.

Petitioner asserts her children are now fine and that she has recovered from her depression. She points to her new practice involving bankruptcy cases in support of her claim that she is now providing competent, valuable legal services and is working within her capabilities. Mr. Ronald Ask, the attorney for whom she presently works, finds her reliable and scrupulously honest. He testified that she carries through with her projects, frequently going to client's homes to give them emotional support, and that she enables many people of meager means to obtain access to the courts.

A psychologist performed a psychological assessment of petitioner in January 1988 and found that she had a high level of morality, was not prone to lying, and was "work oriented."

### 4. Discussion

Petitioner clearly suffered from severe emotional and financial problems that affected some of her clients. As the State Bar Court found, however,

not all of the misconduct can be traced to these problems. Petitioner testified that up to February 1984, she was always able to do a good job for her clients. But many instances of misconduct occurred before this time. The Mason, Reed, Hopkins, Nelson, and Buckley matters all involved misconduct before February 1984. Some of these matters involved very serious violations—misappropriation of client funds and counseling a client to commit perjury. Petitioner's pattern of abandoning clients is particularly disturbing. Her clients should not have been forced to play hide-and-seek as petitioner successively opened and closed her offices. Moreover, she was no longer depressed by late 1987 and, according to her testimony at the mitigation hearing in January 1988, was able to make restitution. Yet we note that she failed to make many payments until January 1989, the eve of the hearing before the review department.

We find the State Bar Court properly weighed the mitigating and aggravating circumstances.[16]

## B. *Amount of Discipline*

Petitioner asserts the discipline is excessive in comparison with the discipline imposed in numerous other cited cases. **(30)** "Each case must be decided on its own merits based on a balanced consideration of all relevant factors. [Citation.] While we may consider the discipline imposed in previous, similar cases in arriving at the appropriate sanction, past disciplinary practices are not binding on this court." (*Levin* v. *State Bar* (1989) 47 Cal.3d 1140, 1150 [255 Cal.Rptr. 422, 767 P.2d 689].)

Among her other misconduct, petitioner was found to have misappropriated money. This is a serious violation because of the harm to the client and the pernicious effect misappropriation has on the public's confidence in the legal profession. We will ordinarily impose the harshest discipline in such cases, absent strong mitigating evidence. (*Chang* v. *State Bar* (1990) 49 Cal.3d 114, 128 [260 Cal.Rptr. 280, 775 P.2d 1049]; see also Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Miscon-

---

[16]During oral argument, petitioner asserted the State Bar erroneously found she suffered extreme emotional difficulties from 1984 to 1987 and that the correct period was 1982 to 1984. The record shows the psychologist who examined petitioner indicated that petitioner did have problems before February 1984: "I would say '82, '83, the quality of her work could not have been as high as it had been previously. But her own acknowledgment that that was true did not occur until February of '84." According to her psychologist, the receipt of "outside documentation" of her shortcomings in February 1984 was the triggering factor "that produced the real dramatic increase in her depression." Although petitioner was depressed before that, she was "denying it and coping fairly well." Given this testimony, we cannot say that the State Bar Court improperly concluded that to the extent some of the misconduct could be traced to severe depression, the depression was present from 1984 to 1987.

duct [hereafter Standards], std. 2.2(a), requiring disbarment unless there is compelling mitigation or the amount of loss is insignificantly small.) Here, balancing mitigating and aggravating circumstances, a reduction of the discipline ordinarily prescribed is unwarranted.

Petitioner also failed on numerous occasions to perform services for clients and to communicate with them. "Habitual disregard by an attorney of the interest of his or her clients combined with the failure to communicate with such clients constitute acts of moral turpitude justifying disbarment." (*McMorris* v. *State Bar* (1983) 35 Cal.3d 77, 85 [196 Cal.Rptr. 841, 672 P.2d 431]; see also Standards, std. 2.4(a).)

As for petitioner's acts of dishonesty, "actual suspension or disbarment [shall be imposed] depending upon the extent to which the victim of the misconduct is harmed or misled and depending upon the magnitude of the act of misconduct and degree to which it relates to the member's acts within the practice of law." (Standards, std. 2.3.) Petitioner made misrepresentations to the court in the Nelson matter. In the Buckley matter, she counseled a client to commit perjury and filed a petition for nullity of marriage knowing that the request was unsupported. These are serious acts that directly pertain to her practice and warrant the harshest discipline. When considered in light of the moral turpitude evidenced in the other counts, petitioner's high degree of dishonesty warrants disbarment.

Petitioner points to the fact that no complaints have been made against her during the last five years, and she asserts that this fact indicates her rehabilitation. The extent of petitioner's rehabilitation is questionable in light of her failure to pay restitution to some of her clients until January 1989, one year after she had sufficient funds to do so. She also believed that it was the State Bar's responsibility to contact her clients and work out a restitution plan. This failure to acknowledge her obligations weakens her claim of rehabilitation and indicates that she has not yet fully accepted responsibility for her misdeeds. Moreover, the interval since her last act of charged misconduct is relatively short. (See *Smith* v. *State Bar* (1985) 38 Cal.3d 525, 540 [213 Cal.Rptr. 236, 698 P.2d 139] [although lack of prior discipline is mitigating factor, six years of practice at time of misconduct is not strong mitigating factor].)

### III. Disposition

In light of the serious nature of petitioner's misconduct and the balance of the aggravating and mitigating circumstances, we conclude the recommendation of the State Bar Court should be adopted.

We hereby order that petitioner Margaret E. Read be disbarred and that her name be stricken from the roll of attorneys in this state. We further order that she comply with the requirements of rule 955 of the California Rules of Court and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. This order is effective on finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)

Petitioner's application for a rehearing was denied May 30, 1991, and the opinion was modified to read as printed above.